441 S.E.2d 728

Donald F. TETER and Charlotte Jean Teter, Plaintiffs Below, Appellees,

v.

OLD COLONY COMPANY, a Corporation; Kelley, Gidley, Blair & Wolfe, Inc., a Corporation; and Francis Divita and Wanda J. Divita, Individually, Defendants Below.

Old Colony Company, a Corporation; and Kelley, Gidley, Blair & Wolfe, Inc., a Corporation, Appellants.

Nos. 21533, 21534.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1993.

Decided Feb. 18, 1994.

John S. Haight, Patricia J. Loehr, and Carol P. Smith, Kay, Casto, Chaney, Love & Wise, Charleston, for appellees.

William E. Hamb and Robert W. Kiefer, Jr., Hamb, Poffenbarger & Bailey, Charleston, for appellant Old Colony Co.

James R. Watson, Steptoe & Johnson, Charleston, for appellant Kelley, Gidley, Blair & Wolfe, Inc.

McHUGH, Justice:

These appeals are brought by the Old Colony Company (Old Colony), a real estate broker corporation, and Kelley, Gidley, Blair & Wolfe, Inc., (Kelley, Gidley), a civil engineering corporation. It involves questions as to their duties to purchasers of a home, Donald F. and Charlotte Jean Teter, who were the plaintiffs below.

In December 1985, the Teters purchased a home located in Charleston, which was listed by Old Colony. Prior to the purchase of the home, the Teters who lived in Franklin, West Virginia, contacted Old Colony regarding available real estate in Charleston. They made arrangements to meet a Mrs. Kracker who worked for Old Colony. They were shown a number of residential properties and finally decided to purchase the property at issue.

During their inspection of the residence, Mr. Teter expressed some concern about a crack in the backyard retaining wall and what appeared to be stone and other rubble below the retaining wall. The backyard sloped rather sharply down to the retaining wall and a barbecue pit was located near it. A system of decks and wooden steps was constructed from the back of the house down to this area. Due to this concern, Mrs. Kracker agreed to secure an engineer to examine the wall and also the house to determine their structural soundness. Contact was made by Mrs. Kracker with Kelley, Gidley, and, on December 2, 1985, a Mr. Wolfe inspected the property. Subsequently, a written report which indicated that the property was in good condition and the retaining wall was sound was sent to Mrs. Kracker. A copy of the report was not sent to the Teters, rather Mrs. Kracker telephoned Mrs. Teter and advised that the report indicated everything was okay. A copy of the report was given to the Teters at the closing of the real estate transaction on December 18, 1985.

After the Teters occupied the property for several years, a landslide occurred on the back of the property. The retaining wall collapsed and substantial damage was done to the decking and steps on the back of the property. It was discovered by another engineer who was retained by the Teters that a large quantity of fill dirt was placed in the slope of the backyard extending to the retaining wall. The Teters filed suit, and, ultimately, the jury awarded the Teters $170,731 in damages plus prejudgment interest. Both Old Colony and Kelley, Gidley appeal contending that the trial court committed numerous errors in setting liability against

them. We first address the liability errors asserted by Old Colony.

## I.

### *Liability of Realty Company*

#### A.

The Teters sought to establish liability against Old Colony on two theories.[1] First, they contended that Old Colony should be liable because it had a duty to make a reasonably diligent inspection of the premises, which would have disclosed the defective condition of the retaining wall. Second, they asserted that because Old Colony contacted Kelley, Gidley to make the engineering inspection of the property, Kelley, Gidley then became Old Colony's agent. Thus, as the principal, Old Colony is liable for Kelley, Gidley's negligent acts in making the inspection and subsequent report to the effect that the retaining wall was in a good condition.

For the initial proposition that a real estate broker has a duty to disclose not only those known defects which substantially affect the value of the property, but also those defects that a reasonably diligent inspection would reveal, the Teters cite *Bevins v. Ballard,* 655 P.2d 757 (Alaska 1982); *Easton v. Strassburger,* 152 Cal.App.3d 90, 199 Cal. Rptr. 383 (1984); *Berryman v. Riegert,* 286 Minn. 270, 175 N.W.2d 438 (1970); *Gouveia v. Citicorp Person-to-Person Fin. Ctr., Inc.,* 101 N.M. 572, 686 P.2d 262 (1984); *Hughes v. Holt,* 140 Vt. 38, 435 A.2d 687 (1981). However, we find that except for *Easton, supra,* these cases turn on a factual pattern in which the real estate broker made affirmative misrepresentations to the prospective purchaser that were factually untrue.[2] In this case, the real estate broker is not claimed to have

---

1. The parties do not make any distinction between the terms "real estate broker," "associate broker," or "real estate salesperson," as they are defined in W.Va.Code, 47–12–2 (1980). From a liability standpoint, Mrs. Kracker's sales activities were attributable to Old Colony without objection.

2. In *Bevins, supra,* the misrepresentation by the broker was that the well had sufficient water to supply the house, but it ran dry a short time after the house was purchased. The purchaser in *Berryman, supra,* informed the broker that he did not want a house with water problems. The

broker advised that the house to be purchased was sufficiently elevated not to have problems. Subsequently, after a heavy rain, one to three inches of water accumulated in the basement. In *Gouveia, supra,* the broker's sales literature described the house as in "All Top Shape." After the sale, the buyer found significant structural and electrical defects. Finally, the broker in *Hughes, supra,* advised that the house was in excellent condition, but after the purchase, the purchasers discovered it had a substantial termite infestation.

made representations that were untrue. Consequently, we find the foregoing cases not particularly helpful in resolving the real estate broker's liability in this case.

The *Easton* case, *supra*, presents a factual situation rather similar to this case. Shortly after the house was purchased, there was substantial earth movement on the property which caused extensive damage to the house and the driveway. Expert testimony indicated that the earth movement was caused by fill placed on the property which was not properly engineered and compacted. Agents from the real estate broker firm had made several inspections of the property and, according to the court, "they were aware of certain 'red flags'[3] which should have indicated to them that there were soil problems." 152 Cal.App.3d at 96, 199 Cal.Rptr. at 386.

The court in *Easton* set out the general law that "requires a broker to disclose to a buyer material defects known to the broker but unknown to and unobserveable by the buyer." 152 Cal.App.3d at 99, 199 Cal.Rptr. at 387. (Citations omitted).[4] The court recognized that where such nondisclosure of known facts occurs, the broker is guilty of fraudulent concealment.[5] However, the buyer's suit in *Easton* was "grounded on negligence rather than fraud." 152 Cal.App.3d at 99, 199 Cal.Rptr. at 387. This procedural point brought the court to consider "whether a broker is negligent if he fails to disclose defects which he should have discovered through reasonable diligence." 152 Cal. App.3d at 99, 199 Cal.Rptr. at 387. The court concluded that such a duty was owed, but made this qualification:

"The duty of the seller's broker to diligently investigate and disclose reasonably discoverable defects to the buyer does not relieve the latter of the duty to exercise reasonable care to protect himself. Cases will undoubtedly arise in which the defect in the property is so clearly apparent that as a matter of law a broker would not be negligent for failure to expressly disclose it, as he could reasonably expect that the buyer's own inspection of the premises would reveal the flaw. In such a case the buyer's negligence *alone* would be the proximate cause of any injury he suffered." 152 Cal.App.3d at 103, 199 Cal.Rptr. at 391. (Emphasis in original).

We have not had occasion to formally determine the nature of the obligation of the vendor's real estate broker to the purchaser of the property. We touched on this issue in *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981), where both the vendor and the vendor's real estate broker were sued by the purchaser on the basis that the broker's advertisement was a substantial misrepresentation of the property.[6] We recognized in *Len-*

3. The opinion described what these "red flags" were:

"There was evidence indicating that one or both of the agents knew that the residence was built on fill and that settlement and erosion problems are commonly associated with such soil. It was additionally established that the agents had seen netting on a slope of the property which had been placed there to repair the slide which occurred most recently prior to the sale. Furthermore, one of the agents testified that he had observed that the floor of a guest house on the property was not level, while the other agent testified that uneven floors were 'red flag' indications of soils [*sic*] problems." 152 Cal.App.3d at 104, 199 Cal. Rptr. at 391.

4. *Easton* also quoted from *Cooper v. Jevne*, 56 Cal.App.3d 860, 866, 128 Cal.Rptr. 724, 727 (1976), which contained a more complete discussion of the rule:

" 'It is the law of this state that where a real estate broker or agent, representing the seller, knows facts materially affecting the value or

the desirability of property offered for sale and these facts are known or accessible only to him and his principal, and the broker or agent also knows that these facts are not known to or within the reach of the diligent attention and observation of the buyer, the broker or agent is under a duty to disclose these facts to the buyer.' " 152 Cal.App.3d at 99, 199 Cal.Rptr. at 387. (Citations omitted).

5. This is the general rule we discuss *infra* at 734–735.

6. The following misrepresentations were asserted in the complaint in *Lengyel*:

"The complaint alleged that the advertisement contained five misrepresentations: (1) that the house was a 'trailer with additions' and was not of 'superb design and quality'; (2) that the house was a 'trailer with additions' and not a '95' × 35' Cedar siding ranch'; (3) that the house was six, not four, years old; (4) that the lot upon which the house was located consisted of only .62 acres of land and not 'one acre'

*gyel* that "[i]t has long been the law in West Virginia that a vendor of real property may be liable to the vendee in an action for fraud." 167 W.Va. at 277, 280 S.E.2d at 69. (Citations omitted).

Although we did not establish a particular syllabus point in *Lengyel* setting out a real estate broker's liability to a purchaser, we did recognize that "there are situations in which a real estate agent may be liable to a purchaser in an action for fraud." 167 W.Va. at 278–79, 280 S.E.2d at 70. In *Lengyel,* we reversed a summary judgment that had been granted in favor of the real estate broker.

Following *Lengyel,* we decided *Thacker v. Tyree,* 171 W.Va. 110, 297 S.E.2d 885 (1982), where we discussed in some detail the obligation of a vendor to make a disclosure to a purchaser with regard to defects that would materially affect the property. We adopted this rule in its Syllabus:

> "Where a vendor is aware of defects or conditions which substantially affect the value or habitability of the property and the existence of which are unknown to the purchaser and would not be disclosed by a reasonably diligent inspection, then the vendor has a duty to disclose the same to the purchaser. His failure to disclose will give rise to a cause of action in favor of the purchaser." [7]

There is a difference between *Lengyel* and *Thacker.* The former deals with misrepresentations regarding the fitness or quality of the property which induced the purchaser to buy it. *Thacker,* on the other hand, places an affirmative duty on the vendor to disclose

defects which are known to him, but unknown to the purchaser even with a reasonably diligent inspection.[8] Both theories are based on fraud, as in the case of *Lengyel* where the purchaser was given false information concerning the quality of the house and the size of the lot, and these misrepresentations came within its Syllabus Point 1:

> "The essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.' *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737 [738] (1927)."

In *Thacker,* the vendor had a duty to disclose known latent defects that materially affected the value of the house, and we said that "in several earlier cases, [we have] recognized the general principle that an action for fraud can arise by the concealment of truth." 171 W.Va. at 113, 297 S.E.2d at 888. (Citations omitted).

The foregoing rules with regard to a vendor's liability to a purchaser have been adopted in other jurisdictions as applying to the vendor's real estate broker. Thus, it is generally held that a vendor's real estate broker may be liable to a purchaser if the broker makes material misrepresentations with regard to the fitness or habitability of residential property or fails to disclose defects or conditions in the property that substantially affect its value or habitability, of

---

as stated in the advertisement; and (5) that the house was not a 'conventional home' as implied by the advertisement." 167 W.Va. at 275, 280 S.E.2d at 68.

7. In Syllabus Point 1 of *Gamble v. Main,* 171 W.Va. 469, 300 S.E.2d 110 (1983), we established an implied warranty of habitability or fitness against the builder and in favor of the purchaser of a new home: "The purchaser of a new home is entitled to an implied warranty of habitability or fitness which requires that the dwelling be constructed by the builder in a workmanlike manner and that the property be reasonably fit for its intended use of human habitation." In *Sewell v. Gregory,* 179 W.Va. 585, 371 S.E.2d 82 (1988), we extended the warranty to a subsequent purchaser.

8. In Syllabus Point 4 of *Stemple v. Dobson,* 184 W.Va. 317, 400 S.E.2d 561 (1990), we held that an "as is" clause in a sales contract would not defeat a purchaser's suit based on fraud for failure to disclose a known defect:

> "The existence of an 'as is' clause in a contract of sale for real estate will not relieve the vendor of his obligation to disclose a condition which substantially affects the value or habitability of the property and which condition is known to the vendor, but not to the purchaser, and would *not* be *disclosed by a reasonable and diligent inspection.* Such failure to disclose constitutes fraud."

which the broker is aware or reasonably should be aware, but the purchaser is unaware and would not discover by a reasonably diligent inspection. *See, e.g., Bevins v. Ballard, supra; Easton v. Strassburger, supra; Dyer v. Johnson,* 757 P.2d 178 (Colo. App.1988); *Revitz v. Terrell,* 572 So.2d 996 (Fla.App.1990); *Shaffer v. Earl Thacker Co., Ltd.,* 6 Haw.App. 188, 716 P.2d 163 (1986); *Harkala v. Wildwood Realty, Inc.,* 200 Ill. App.3d 447, 146 Ill.Dec. 232, 558 N.E.2d 195 (1990); *Ditcharo v. Stepanek,* 538 So.2d 309 (La.App.), *writ denied,* 541 So.2d 858 (1989); *Berryman v. Riegert, supra; Gouveia v. Citicorp Person-to-Person Fin. Ctr., Inc., supra; Johnson v. Beverly–Hanks & Assoc., Inc.,* 328 N.C. 202, 400 S.E.2d 38 (1991); *Sanfillipo v. Rarden,* 24 Ohio App.3d 164, 493 N.E.2d 991 (1985); *Smith v. Renaut,* 387 Pa.Super. 299, 564 A.2d 188 (1989); *Henry S. Miller Co. v. Bynum,* 797 S.W.2d 51 (Tex. App.1990); *Hoffman v. Connall,* 108 Wash.2d 69, 736 P.2d 242 (1987). *See generally* 37 Am.Jur.2d *Fraud & Deceit* § 158 (1968); Annot., 46 A.L.R.4th 546 (1986). It also must be shown that the misrepresentation or concealment was a substantial factor in inducing the purchaser to buy the property. *See* Syllabus Point 1, *Lengyel v. Lint, supra.*

The basis for the foregoing rule is a recognition by the courts that even though a broker has a contract with a vendor to sell the real estate, most of the broker's contact is with the purchaser. As a licensed professional, a broker is obligated to deal fairly with the purchaser. The Supreme Court of Washington in *Hoffman v. Connall,* 108 Wash.2d at 75, 736 P.2d at 245, gave this summary, quoting from its appellate division

case of *Tennant v. Lawton,* 26 Wash.App. 701, 706, 615 P.2d 1305, 1309–10 (1980):

" 'The underlying rationale of [a broker's] duty to a buyer who is not his client is that he is a professional who is in a unique position to verify critical information given him by the seller. His duty is to take reasonable steps to avoid disseminating to the buyer false information. The broker is required to employ a reasonable degree of effort and professional expertise to confirm or refute information from the seller which he knows, or should know, is pivotal to the transaction from the buyer's perspective.' (Citations omitted)."

The Kansas Supreme Court in *Johnson v. Geer Real Estate Co.,* 239 Kan. 324, 720 P.2d 660 (1986), decided that its real estate brokers' licensing act which contained grounds for revocation of a broker's license sets the standard of care for brokers with regard to purchasers and concluded in its Syllabus Point 5: "An action for damages against a Kansas real estate broker may be predicated upon negligent violation of K.S.A. 58–3062, a part of the Kansas Real Estate Brokers' and Salespersons' License Act."

Our general rule is consistent with the provisions of W.Va.Code, 47–12–11 (1959), relating to acts that may cause the suspension or revocation of a real estate broker's or salesperson's license.[9]

### B.

Having established the general rule in regard to a broker's duty to a purchaser, we find that the plaintiffs do not charge in this case that there was a material misrepresentation made on the part of the broker.

---

9. W.Va.Code, 47–12–11, in pertinent part, states: "The commission shall have full power to refuse a license for reasonable cause or to revoke or suspend a license where it has been obtained by false or fraudulent representation, or where the licensee in performing or attempting to perform any of the acts mentioned herein, is deemed to be guilty of:

"(1) Making any substantial misrepresentation, or

"(2) Making any false promises or representations of a character likely to influence, persuade, or induce, or

"(3) Pursuing a continued or flagrant course of misrepresentation, or making of false promises or representations through agents or salesmen or any medium of advertising or otherwise, or

"(4) Any misleading or untruthful advertising, including the unauthorized use of the term 'realtor' by one not a member of the national association of real estate boards, or using any other trade name or insignia of membership in any real estate organization, of which the licensee is not a member[.]"

In 1993, amendments were made to W.Va.Code, 47–12–11, and the language of subsections (1) through (4) is similar to the foregoing.

Nor do plaintiffs assert that the broker concealed a significant latent defect in the property of which the broker was aware or reasonably should have been aware. Rather plaintiffs claim that because of the broker's superior knowledge, there was a duty to investigate and discover whether the retaining wall was defective.

We decline to hold that a broker has an independent duty to inspect and uncover latent defects on residential premises. We agree with this statement from *Hoffman, supra,* where the court quoted from *Provost v. Miller,* 144 Vt. 67, 69–70, 473 A.2d 1162, 1164 (1984), that " '[r]eal estate brokers and agents are marketing agents, not structural engineers or contractors.' " [10]  108 Wash.2d at 74, 736 P.2d at 244–45. *See also Lyons v. Christ Episcopal Church,* 71 Ill.App.3d 257, 27 Ill.Dec. 559, 389 N.E.2d 623 (1979). We dealt with a situation in *Gamble v. Main,* 171 W.Va. 469, 300 S.E.2d 110 (1983), where the contractor who built the plaintiffs' house was sued because the septic system was defective. We discussed a number of defective soil condition cases pointing out that the contractor could be held liable if he knew or reasonably should have known of the adverse soil conditions. We found in *Gamble* that the plaintiffs' adverse verdict should not be set aside and concluded in Syllabus Point 2: "The implied warranty of habitability or fitness does not extend to adverse soil conditions which the builder is unaware of or could not have discovered by the exercise of reasonable care." Other jurisdictions have declined to hold a broker to a duty to make an independent inspection to uncover latent defects. *See, e.g., Harkala v. Wildwood Realty, Inc., supra; Emerson v. Ham,* 411 A.2d 687 (Me.1980); *Brown v. Pritchett,* 633 S.W.2d 294 (Mo.App.1982); *Provost v. Miller, supra; Hoffman v. Connall, supra.*

In this case, there was an independent investigation of the soundness of the retaining wall and the structural soundness of the residential structure by a competent civil engineering firm made at the request of the plaintiffs. This report indicated that the premises were in a sound structural condition. Old Colony was entitled to rely on this report.

### C.

We also conclude that Old Colony by hiring Kelley, Gidley, upon the request of the plaintiffs, did not have an agency relationship with Kelley, Gidley in order to become responsible for its negligence. We gave this general definition of an agent in Syllabus Point 3 of *State ex rel. Key v. Bond,* 94 W.Va. 255, 118 S.E. 276 (1923):

"An agent in the restricted and proper sense is a representative of his principal in business or contractual relations with third persons; while a servant or employee is one engaged, not in creating contractual obligations, but in rendering service, chiefly with reference to things but sometimes with reference to persons when no contractual obligation is to result."

As pointed out in Section 2 of 3 Am.Jur.2d *Agency* at 510 (1986), one of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent: "[O]ne of the prime elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." (Footnote omitted). *See also Nichols v. Arthur Murray, Inc.,* 248 Cal.App.2d 610, 56 Cal.Rptr. 728 (1967); *Peairs v. Florida Pub. Co.,* 132 So.2d 561 (Fla.App.1961); *Automobile Finance Co. v. Kesk, Inc.,* 200 So.2d 136

---

**10.** W.Va.Code, 47–12–4 (1993), contains the qualifications to obtain a broker's license. It does not require any substantial technical or educational background. It requires that the applicant be of good character, a citizen eighteen years of age or over, and served a "bona fide apprenticeship as a licensed real estate salesperson for two years or shall produce to the real estate commission satisfactory evidence of real estate experience." W.Va.Code, 47–12–4(1). Under subsection (2), a "broker's or salesper-

son's license may be issued to any person who is either a high school graduate or the holder of a certificate of high school equivalency." In addition, subsection (4) provides that "[a]pplicants for a salesperson's license shall show evidence satisfactory to the commission that they have completed at least ninety clock-hours (six credit hours) of formal instruction in a real estate course ... approved by the commission." These same requirements were contained in W.Va. Code, 47–12–4 (1980).

(La.App.1967); *Van Pelt v. Paull,* 6 Mich. App. 618, 150 N.W.2d 185 (1967); *Agee v. Gant,* 412 P.2d 155 (Okla.1966); *Fernander v. Thigpen,* 278 S.C. 140, 293 S.E.2d 424 (1982); *Carr v. Hunt,* 651 S.W.2d 875 (Tex. App.1983).

■ Here, there is no evidence demonstrating that the broker retained any control over the manner in which the engineering firm performed its inspection of the premises. Consequently, the trial court should have directed a verdict in favor of Old Colony on the agency question, as well as on the liability issue. For the foregoing reasons, the judgment against Old Colony is reversed, and we apply the rule contained in Syllabus Point 5 of *Adkins v. INCO Alloys International, Inc.,* 187 W.Va. 219, 417 S.E.2d 910 (1992):

> " 'When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant.' Syllabus Point 3, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964)."

*See also* Syllabus Point 3, *Williamson v. Sharvest Management Co.,* 187 W.Va. 30, 415 S.E.2d 271 (1992).

## II.

### *Kelley, Gidley Errors*

Kelley, Gidley asserts several errors of a procedural nature. First, it contends that the special verdict form given to the jury pursuant to Rule 49(a) of the West Virginia Rules of Civil Procedure was deficient in two respects (1) by asking the jury to determine whether the real estate broker was acting as plaintiffs' agent in hiring Kelley, Gidley, and (2) by altering the verdict form on the issue of negligence as proximately causing the plaintiffs' damages. Other errors involve the calculation of prejudgment interest, the statute of limitations, and the admissibility of evidence.

## A.

■ Initially, Kelley, Gidley argues that the jury was given a special verdict form under Rule 49(a) [11] and cites from an annotation entitled *Submission of Special Interrogatories in Connection with General Verdict Under Federal Rule 49(B), and State Counterparts,* 6 A.L.R.3d 438, 440 (1966):

> "A special verdict is one in which the jury finds *all* the facts and then refers the case to the court for a decision on those facts. It is rendered in lieu of a general verdict and contains findings on *all* material issues in the case. Special interrogatories, on the other hand, are propounded as to *selected* issues of fact, and answers to them are always, or at least normally, given in connection with, not in substitution of, a general verdict." (Emphasis added).

The scope of the issues that must be submitted to a jury where a Rule 49(a) procedure is used is outlined in C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2506 at 498–500 (1971), as follows:

> "The court has considerable discretion about the nature and scope of the issues to be submitted to the jury under Rule 49(a) so long as they present the case fairly. All material factual issues should be covered by the questions submitted. The court need not and should not, however, submit an issue that can be properly resolved as a matter of law. It is not error to refuse to put an issue that is adequately covered by other questions that have been put." (Footnotes omitted).

We believe that the verdict form submitted in this case was not done under Rule 49(a), but was done under Rule 49(b) [12] since the

**11.** Our Rule 49(a), which is parallel to Rule 49(a) of the Federal Rules of Civil Procedure, states, in relevant part:

> "*Special verdicts.*—The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer.... The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue."

**12.** Rule 49(b) of the West Virginia Rules of Civil Procedure states in relevant part:

> "*General verdict accompanied by answer to interrogatories.*—The court may submit to the

jury was given interrogatories and a general verdict form as to damages. Even if we are mistaken on this rather arcane procedural issue, it is clear that Kelley, Gidley was not entitled to have the jury determine whether Old Colony's broker was an agent of the plaintiffs.

Earlier we discussed the agency question as to the real estate broker's relationship with Kelley, Gidley and concluded that there was no agency relationship. What is argued now by Kelley, Gidley is that the broker by hiring Kelley, Gidley was acting as an agent of the plaintiffs. Consequently, it argues that the negligence of the broker in failing to communicate the exact nature of the engineering inspection desired [13] and in failing to communicate to the plaintiffs the entire engineering report prior to the closing should have been charged to the plaintiffs.

■ This argument legally is unsound because Kelley, Gidley was acting as an independent contractor in the performance of its engineering inspection of the property. Neither the plaintiffs nor the real estate broker exercised any control over the manner in which the engineering inspection would be made. Moreover, the critical negligence issue against Kelley, Gidley was its failure to discern the defective condition of the retain-

ing wall and the soil behind it. It is apparent from the engineer's report that this was a part of the inspected area.[14] Kelley, Gidley was not an employee or agent of either the plaintiffs or the broker, such that the doctrine of respondeat superior was applicable. As we stated in Syllabus Point 5 of *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990):

> "There are four general factors which bear upon whether a master-servant relationship exists for purposes of the doctrine of *respondeat superior*: (1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative."

Thus, from a legal standpoint, the plaintiffs cannot be charged with any alleged negligent communication by the broker.

#### B.

■ The second procedural error is that the judge after the jury had been deliberating for some period altered the verdict form by changing the nature of the inquiry to the jury. The original inquiry asked the jury whether it found that the defendant, Kelley, Gidley, was negligent and that such negli-

jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict."

13. Kelley, Gidley primarily complains that in addition to Mr. Teter's concern over the crack in the retaining wall, Mrs. Kracker failed to alert its engineer that there was rock and other debris below the wall. This condition was open and apparent.

14. Despite Kelley, Gidley's argument that it lacked sufficient information as to the scope of the inspection, its report suggests otherwise. Its text is:

"In accordance with your instructions the undersigned inspected the subject dwelling on December 2, 1985.

"This property is in outstanding condition from a structural standpoint. It is well con-

structed with good quality materials and has the obvious appearance of having been carefully maintained. Foundations are free of any stress cracking; wood framing is plumb and level and of adequate size; doors and windows are square and free to operate without any evidence of binding; and plaster (drywall) surfaces are virtually free of cracks and exhibit absolutely no indication of settlement or deflection stresses.

"We also inspected a series of wood decks on the hillside at the rear of the house. In general these structures are well constructed using treated lumber and are supported by posts erected upon concrete footings. Some nailed joints, however, have become loose and should be re-fastened as necessary. Also, a rather large crack has appeared in one brick faced concrete retaining wall, probably due to settlement. Some repointing of the brick joints for cosmetic purposes is indicated but otherwise the wall is structurally sound and should be no cause for concern.

"We thank you for this opportunity to be of service and trust this report will prove to be to your satisfaction. Please call upon us if you require further assistance in this matter."

gence proximately caused or contributed to the plaintiffs' damages. The alteration omitted any reference to the plaintiffs' damages, but asked whether Kelley, Gidley "was negligent and that such negligence proximately caused or contributed to the Teters['] buying the ... property."

Although Kelley, Gidley objected to this alteration, its argument before us is in the context of a Rule 49(a) procedural flaw that withdrew a legal defense, i.e., whether its negligence caused the plaintiffs' damages. We think the two issues are interrelated where there is a defective condition not observable on the part of the purchaser because of a lack of expertise.

The plaintiffs' theory against Kelley, Gidley was that it, as an engineering firm, had a duty to exercise reasonable care to determine if there were defective conditions on the premises from an engineering standpoint. The plaintiffs' expert testified that the retaining wall was defective and collapsed because of the pressure of filled soil behind it. The expert also testified that a civil engineer should have observed this defective condition.[15]

■■■■ Inherent in any suit for damages arising from a buyer's contention that there has been a failure to disclose a material defect unknown to the buyer is the claim that the buyer would not have made the purchase if he had been aware of the defect. Our case law is consistent with this result by requiring that the buyer may be chargeable for a defect that a reasonable inspection would disclose. *See Stemple v. Dobson,* 184 W.Va. 317, 400 S.E.2d 561 (1990); *Thacker v. Tyree, supra.*

■■■ The cause of action may be said to arise when the failure to disclose brought about the purchase of the defective property. However, it is not until the defect is discovered that the damages can be ascertained. Thus, the cause of action matures when the actual damage occurs. We discussed the general law in the context of concealment of termite infestation of a house in *Stemple v. Dobson, supra,* and concluded in Syllabus Point 3:

"Where a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury."

In this case, the plaintiffs claimed Kelley, Gidley's negligent inspection concealed material defects surrounding the retaining wall which subsequently gave way causing serious property damage. This cause of action arose when the deficient report, stating the retaining wall was solid, was given to the plaintiffs, and they relied upon it to purchase the property. This same general theory was embodied in Kelley, Gidley's Instruction No. 8.[16]

---

15. Kelley, Gidley does not appear to dispute that a duty of reasonable care to properly inspect for engineering defects is the proper legal standard. The Arizona court expressed this principle in *National Housing Industries, Inc. v. E.L. Jones Development Co.,* 118 Ariz. 374, 377, 576 P.2d 1374, 1377 (1978): "The duty of an engineer, whether based in tort or arising from a breach of contract, is to exercise the degree of skill, care, and diligence as engineers ordinarily exercise under like circumstances." *See also Rhodes–Haverty Partnership v. Robert & Co. Assoc.,* 163 Ga.App. 310, 293 S.E.2d 876 (1982), *aff'd,* 250 Ga. 680, 300 S.E.2d 503 (1983); *City of Eveleth v. Ruble,* 302 Minn. 249, 225 N.W.2d 521 (1974).

16. Kelley, Gidley's Instruction No. 8 states:
"The Court instructs the jury that when a professional engineer undertakes to render services by providing information for the guidance of others, he is obligated to exercise that degree of care normally used under the same or similar circumstances by other professional engineers practicing in the same general locale. If the engineer fails to use that degree of care and by so doing provides or fails to provide material information, he may be liable for any reasonably foreseeable economic loss proximately caused to be sustained by such persons who may have justifiably relied upon such false information.

"In this regard, if it appears by the greater weight, or preponderance of evidence that Mr. and Mrs. Teter have the burden of proving that in rendering his services on behalf of Kelley, Gidley, Blair & Wolfe, Robert L. Wolfe:

1. knew or should have known that Dr. and Mrs. Teter would rely upon the services rendered by him for guidance in connection with their purchase of the Divita property;

2. provided or failed to provide material information which was false;

3. failed to exercise that degree of care usually exercised by other engineers practicing

We find no reversible error in the altered verdict form given to the jury simply because Kelley, Gidley's Instruction No. 8 correctly outlined its legal theory of liability. Among its requirements was that the plaintiffs must prove that they "would rely upon the services rendered by ... [Kelley, Gidley] ... in connection with their purchase of the Divita property; ... provided or failed to provide material information which was false[.]"

### C.

■ Kelley, Gidley also assigns error in the trial court's allowing plaintiffs' expert real estate appraiser, Mr. Barth, to testify with regard to the value of the damaged real estate. He had been appraising real estate, both residential and commercial, for more than forty years, including working for a number of urban renewal and public housing authorities both in Charleston and throughout West Virginia and also Allegheny County, Pennsylvania. Undoubtedly, Mr. Barth would have qualified as an expert under Rule 702 of the West Virginia Rules of Evidence and our cases decided thereunder.[17]

The thrust of Kelley, Gidley's objection was that W.Va.Code, 37–14–2 and –3 (1991), which are parts of the Real Estate Appraiser Licensing and Certification Act (Act), pre-

clude appraisal testimony in court unless the appraiser is licensed under the Act. Specific reference is made to W.Va.Code, 37–14–2(c):

" 'Appraisal report' means any communication, written or oral, of an appraisal. An appraisal report may be classified by the nature of the assignment as a 'valuation report', 'analysis report' or 'review report'. For the purposes of this article, *the testimony of an appraiser dealing with the appraiser's analyses, conclusions or opinions concerning identified real estate or identified real property is deemed to be an oral appraisal report* [.]" (Emphasis added).

Moreover, W.Va.Code, 37–14–3(a), makes it "unlawful for any person, for compensation or valuable consideration, to prepare a valuation appraisal or a valuation appraisal report relating to real estate or real property in this state without first being licensed or certified as provided in this article."[18]

It appears that part of the impetus for our Act was brought about by congressional legislation enacted in 1989 to curb real estate appraisal abuses occurring in federal savings and loan and other federally related financial institutions. *See generally* 12 U.S.C.A. § 3331, *et seq.* (1989).[19] Prior to the passage

---

in his community under the same or similar circumstances.

Therefore, if it appears by the greater weight of the evidence either that Mr. Wolfe, in rendering his services, did so in a manner falling below that standard of engineering competence practiced by other members of the engineering profession in this area, or that Dr. and Mrs. Teter's reliance upon Mr. Wolfe's report was reasonable, then you may find Kelley, Gidley, Blair & Wolfe to be guilty of negligence."

**17.** Rule 702 of the Rules of Evidence states:

"**Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

**18.** W.Va.Code, 37–14–3(a), states in its entirety:

"Beginning the first day of July, one thousand nine hundred ninety-one, it is unlawful for any person, for compensation or valuable consideration, to prepare a valuation appraisal or a valuation appraisal report relating to real estate or real property in this state without first

being licensed or certified as provided in this article. This section shall not be construed to apply to persons who do not render significant professional assistance in arriving at a real estate appraisal analysis, opinion or conclusion. Nothing in this article, however, shall be construed to prohibit any person who is licensed to practice in this state under any other law from engaging in the practice for which he or she is licensed."

In addition, W.Va.Code, 37–14–4, contains other exceptions to the license or certification requirements, but they are not applicable to this case.

**19.** 12 U.S.C.A. § 3331 states:

"The purpose of this chapter is to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision."

Our statute makes reference to the federal act. *See* W.Va.Code, 37–14–4.

of our Act, we had no specific statute that licensed real estate appraisers. We discern nothing within the context of the federal act that imposes a federal requirement upon appraisal reports dealing with real estate that is not involved with a federally regulated loan. Moreover, we are not cited nor have we found in the federal act or any federal regulations adopted under it language similar to W.Va.Code, 37–14–2(c).

■ There is a certain ambiguity in this subsection as to the extent of its coverage under the phrase "the testimony of an appraiser dealing with the appraiser's analyses ... is deemed to be an oral appraisal report[.]" W.Va.Code, 37–14–2(c).[20] We decline to interpret this section to prevent the operation of the common law rules of evidence which we have codified in our Rules of Evidence. We have traditionally held that statutes in derogation of the common law are to be strictly construed. As we pointed out in Syllabus Point 6 of *City of Fairmont v. Retail, Wholesale, and Department Store Union, AFL–CIO*, 166 W.Va. 1, 283 S.E.2d 589 (1980):

> " 'Statutes in derogation of the common law are allowed effect only to the extent clearly indicated by the terms used. Nothing can be added otherwise than by necessary implication arising from such terms.' Syllabus Point 3, *Bank of Weston v. Thomas*, 75 W.Va. 321, 83 S.E. 985 (1914)."

■ Here, we find the provisions of W.Va.Code, 37–14–2(c), to be ambiguous with regard to the question of whether this statute was designed to foreclose anyone but a licensed real estate appraiser from testifying in court with regard to the value of real estate or damages to real estate. We, therefore, decline to hold that W.Va.Code, 37–14–1, *et seq.*, is designed to prevent an expert otherwise qualified under Rule 702 of the Rules of Evidence from testifying with regard to the value of real property or the damages that may have resulted to it.

■ Moreover, even if the statute was more specific and stated that no person except a licensed appraiser could testify with regard to the value of damaged real estate in any court proceeding, we would find this to be contrary to our Rules of Evidence. In particular, it would be contrary to Rule 402, which states "[a]ll relevant evidence is admissible," [21] and, as earlier stated, Rule 702, which relates to expert testimony. We have been granted under Section 3 of Article VIII of the West Virginia Constitution rule-making authority in judicial proceedings as follows: "The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law." It is pursuant to this authority that we have promulgated not only uniform rules relating to civil and criminal procedure and evidence, but also many other procedural rules found in the Court Rules volume of Michie's West Virginia Code. In *Bennett v. Warner*, 179 W.Va. 742, 372 S.E.2d 920 (1988), we set out in Syllabus Points 1 and 2 the scope of our rule-making authority:

> "1. Under article eight, section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure,

---

**20.** It might be suspected that W.Va.Code, 37–14–1, *et seq.*, was drawn from an Illinois statute since we have this peculiar language in W.Va. Code, 37–14–2(b): " 'Appraisal foundation' means the appraisal foundation established on the thirtieth day of November, one thousand nine hundred eighty-seven, as a not-for-profit corporation under the *laws of Illinois* [.]" (Emphasis added).

However, the Illinois statute does not contain the testimony language found in W.Va.Code, 37–14–2(c). *See* Ill.Ann.Stat. ch. 225, para. 455/36.1 (Smith–Hurd 1992). Moreover, under Ill.Ann. Stat. ch. 225, para. 455/36.2(c) (Smith–Hurd 1992), this statement is made: "This Article does not preclude a person who is not certified or licensed as a real estate appraiser from appraising real estate in this State for compensation."

**21.** The full text of Rule 402 of the Rules of Evidence is:

> "**Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of West Virginia, these rules, or other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible."

which shall have the force and effect of law.

"2. 'Under Article VIII, Section 8 [and Section 3] of the Constitution of West Virginia (commonly known as the Judicial Reorganization Amendment), administrative rules promulgated by the Supreme Court of Appeals of West Virginia have the force and effect of statutory law and operate to supersede any law that is in conflict with them.' Syl. Pt. 1, *Stern Brothers, Inc. v. McClure,* 160 W.Va. 567, 236 S.E.2d 222 (1977)."

Other jurisdictions have considered the question of whether the legislature may by statute promulgate a rule that is contrary to court evidentiary rules. For example, the Supreme Court of Arizona in *State ex rel. Collins v. Seidel,* 142 Ariz. 587, 691 P.2d 678 (1984) (en banc), addressed the question of whether a legislative enactment regarding the admissibility of blood alcohol tests in drunk driving cases was contrary to its rules of evidence and began its analysis stating:

"The constitution of Arizona gives the Supreme Court the power to make rules relative to all procedural matters in any court. Article 6, § 5(5). Pursuant to that authorization, this court promulgated the Rules of Evidence to take effect on September 1, 1977. Rules of evidence have generally been regarded as procedural in nature. *Ammerman v. Hubbard Broadcasting, Inc.,* 89 N.M. 307, 310, 551 P.2d 1354, 1357 (1976); thus, our promulgation of these rules was within the power granted us by the constitution. *See also* 1 Wigmore on Evidence, § 7, 462–63 n. 1 (Tillers rev. 1983)." 142 Ariz. at 590, 691 P.2d at 681.[22]

The court in *Collins* went on to analyze the legislative enactment and concluded that it did not infringe on its rules of evidence. It further made this general statement:

"That we possess the rule-making power does not imply that we will never recognize a statutory rule. We will recognize 'statutory arrangements which seem reasonable and workable' and which supplement the rules we have promulgated. *Alexander v. Delgado,* 84 N.M. 717, 718, 507 P.2d 778, 779 (1973). However, when a conflict arises, or a statutory rule tends to engulf a general rule of admissibility, we must draw the line. The legislature cannot repeal the Rules of Evidence or the Rules of Civil Procedure made pursuant to the power provided us in article 6, § 5. *Ammerman v. Hubbard Broadcasting, Inc.,* [89 N.M. 307, 551 P.2d 1354 (1976)]; *cf. State v. Herrera,* 92 N.M. 7, 582 P.2d 384 (1978)." 142 Ariz. at 591, 691 P.2d at 682.

*See also State ex rel. Woods v. Filler,* 169 Ariz. 224, 818 P.2d 209 (1991). The Michigan court reached the same result on a breathalyzer test statutory provision utilizing its constitutional rule-making authority in *People v. McDonald,* 201 Mich.App. 270, 505 N.W.2d 903 (1993).

The Arizona Supreme Court in *Collins* cited the New Mexico Supreme Court case of *Ammerman v. Hubbard Broadcasting, Inc.* 89 N.M. 307, 551 P.2d 1354 (1976), which dealt with the validity of a legislative act giving a privilege of nondisclosure to journalists. Initially, the court determined that its rules of evidence were procedural rules. It then quoted this language from its earlier case of *State ex rel. Anaya v. McBride,* 88 N.M. 244, 246, 539 P.2d 1006, 1008 (1975):

" 'Our constitutional power under N.M. Const. art[.] III, § 1 and art. VI, § 3 of superintending control over all inferior courts carries with it the inherent power to regulate all pleading, practice and procedure affecting the judicial branch of government. . . .

"Under the Constitution, the legislature lacks the power to prescribe by statute

---

**22.** The court in note 4 of *Collins,* 142 Ariz. at 590, 691 P.2d at 681, spoke to the rule-making powers of the United States Supreme Court:

"The federal constitution does not confer such power on the Supreme Court of the United States. Congress has 'plenary authority over the promulgation of evidentiary rules for the federal courts.' *Usery v. Turner Elkhorn*

*Mining Co.,* 428 U.S. 1, 31, 96 S.Ct. 2882, 2900, 49 L.Ed.2d [752, 755] (1976). This authority has been delegated to federal courts by 28 U.S.C. 2071 (1948) and 28 U.S.C. 2076 (1975), but the statutes make it clear that any rule promulgated by the courts must be consistent with Acts of Congress."

rules of practice and procedure, although it has in the past attempted to do so. Certainly statutes purporting to regulate practice and procedure in the courts cannot be made binding, for this constitutional power is vested exclusively in this court.'" 89 N.M. at 311, 551 P.2d at 1358. (Citations omitted).

*See also State ex rel. Reynolds v. Holguin,* 95 N.M. 15, 618 P.2d 359 (1980).

Several courts even without explicit constitutional authority have determined that legislation inconsistent with court-promulgated rules of evidence is invalid. They generally refer to language in their rules of evidence that is similar to Rule 101 of our Rules of Evidence.[23] *See, e.g., State v. Zimmerman,* 121 Idaho 971, 829 P.2d 861 (1992). Finally, we note that the Minnesota Supreme Court in *State v. Lanam,* 459 N.W.2d 656, 658 (Minn.1990), grounded its right to enact evidentiary rules on its constitutional separation of powers doctrine, stating: "Although we have the primary responsibility under the separation of powers doctrine for the regulation of evidentiary matters, we have enforced reasonable statutory rules of evidence as a matter of comity if the rules are not in conflict with the Minnesota Rules of Evidence." (Citations omitted).

Based on this authority, it is clear that a legislative enactment which is substantially contrary to provisions in our Rules of Evidence would be invalid.

### D.

▇ Finally, we agree with the Kelley, Gidley, that error was committed in giving prejudgment interest from 1985 which was the date the house was purchased by the plaintiffs. The actual damages to the property did not occur until March of 1990. We have earlier discussed in Part II(B), *supra,* that it was not until this date that the cause of action accrued in this case. We utilized this approach in *Board of Education v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990), where damages were sought for the defective construction of a school. Over several years, there was a gradual developing damage pattern beginning with the cracking of the walls, the loss of a steel support beam, and finally the collapse of a wall in the gymnasium. We concluded that "the major damage had occurred at least by 1983" and awarded prejudgment interest from that date forward. 182 W.Va. at 611, 390 S.E.2d at 810.

▇ The plaintiff is entitled to interest on the full amount of the jury verdict after deducting the plaintiffs' comparative negligence,[24] because Kelley, Gidley did not ask for a special interrogatory to separate the liquidated damages from the general damages. We apply Syllabus Point 2 of *Beard v. Lim,* 185 W.Va. 749, 408 S.E.2d 772 (1991):

"We will not, in every case, refrain from sorting out errors involving prejudgment interest, but when the defendant fails to submit a special jury interrogatory asking the jury to set forth special or liquidated damages this Court's attention to such errors is entirely a matter of grace and if the subject is deliberately obfuscated by coun-

---

**23.** Rule 101 of the West Virginia Rules of Evidence states:

"**Scope.** These rules govern proceedings in the courts of this State to the extent and with the exceptions stated in Rule 1101. Rules of evidence set forth in any West Virginia statute not in conflict with any of these rules or any other rules adopted by the Supreme Court of Appeals shall be deemed to be in effect until superseded by rule or decision of the Supreme Court of Appeals."

**24.** The plaintiffs in this case were found to be 32.5 percent negligent. This percentage is less than the 50 percent that would bar them from any recovery under our comparative/contributory negligence doctrine contained in *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979). Moreover, as we stated in Syllabus Point 2 of *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982), we still retain the concept of joint and several liability among joint tortfeasors. The fact that Old Colony has been released from liability does not affect the judgment against Kelley, Gidley simply because the damages were unitary, that is to say, they were identical with regard to claims made by the plaintiffs against each party. In *Stone v. Rudolph,* 127 W.Va. 335, 32 S.E.2d 742 (1944), we recognized that under W.Va.Code, 58–5–25, that "[a] joint judgment based on a jury verdict against two defendants may be reversed by this Court as to one, and affirmed as to the other[.]" Syllabus Point 7, in part. *See also* W.Va.Code, 56–6–32.

sel or error is invited, this Court will summarily dismiss the assignment.' Syl. Pt. 7, *Miller v. Monongahela Power Co.*, 184 W.Va. 663, 403 S.E.2d 406 (1991)."

Thus, on remand, the trial court should recalculate the interest from the spring of 1990 when ground slippage occurred and then enter an appropriate judgment in favor of the plaintiffs and against the defendant Kelley, Gidley.

### III.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Kanawha County as to liability against Kelley, Gidley, but remand the case for recalculation of the prejudgment interest. The verdict as to Old Colony is reversed.

Affirmed, in part, reversed, in part, and remanded.