425 S.E.2d 264

**Alvie R. FORTNEY, Plaintiff Below, Appellee,**

**v.**

**Gabriel E. AL–HAJJ, M.D., Henry Breland, M.D.; and Edmundo E. Figueroa, M.D., Defendants Below,**

**Henry Breland, M.D., Appellant.**

**No. 20926.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1992.

Decided Dec. 18, 1992.

Robert V. Berthold, Jr., Tony L. O'Dell, Robin K. Welch, Charleston, for appellee.

Charles F. Johns, Steptoe & Johnson, Charleston, for appellant.

PER CURIAM:

This is an appeal by Dr. Henry Breland from a final judgment of the Circuit Court of Kanawha County denying Appellant Dr. Breland's motion to set aside a jury verdict and motion for judgment notwithstanding the verdict.[1] Subsequent to a jury trial, a $343,135.80 jury verdict was returned against the Appellant. The Appellant contends that the lower court committed various errors which justify reversal of the judgment against him. We disagree with the Appellant's contentions and affirm the decision of the Circuit Court of Kanawha County.

I.

On November 23, 1987, Appellee Alvie R. Fortney arrived at the emergency room of Herbert J. Thomas Memorial Hospital explaining that he thought he had lodged a piece of chicken meat in his esophagus while eating dinner. Appellant Dr. Henry Breland examined the Appellee at the emergency room and ordered a barium swallow test, a procedure designed to identify foreign objects lodged in the upper gastrointestinal tract. The test is conducted by instructing a patient to drink a radiopaque liquid while x-rays are being taken. The presence of the liquid then delineates any irregularities of the gastrointestinal system. Dr. Breland ordered the test to determine whether the piece of chicken was still lodged in the Appellee's esophagus. At the time Dr. Breland ordered the test, the Appellee was not demonstrating any signs of breathing difficulty which could have indicated a perforation of his esophagus.

The Appellee was taken to the radiology department of Thomas Memorial for the performance of the test. As the Appellee's expert agreed, it was not the responsibility of Dr. Breland to actually perform the test. As the Appellee attempted to drink the barium, his esophagus filled quickly, and the barium began coming back out of his mouth. The radiological technician instructed the Appellee to continue drinking the barium, and the Appellee then began to gag on the solution. All witnesses at trial agreed that the retching and gagging in the radiology department caused a perforation in the Appellee's esophagus.

When the Appellee returned to the emergency room and Dr. Breland, he was in extreme pain, and Dr. Breland became concerned about the possibility of a heart attack. Dr. Breland therefore ordered an EKG which was returned with a normal reading. Dr. Breland also contacted a consultant, gastroenterologist Dr. Timothy Harper. The barium swallow test had indicated the presence of a foreign object lodged where the esophagus joins the stomach and had also shown evidence of a perforation in the Appellee's esophagus. Dr. Harper then attempted to remove the chicken through an endoscopic procedure. During that procedure, a long flexible scope is inserted into the patient's throat in order to view any objects lodged in the esophagus. Dr. Harper suctioned out the barium in the appellee's esophagus but was unable to remove the chicken with forceps inserted down the scope.

Dr. Edmundo Figueroa, a cardiothoracic surgeon, was then consulted. Dr. Figueroa performed surgery, but no perforation in the esophagus was found. The physicians concluded that the perforation had resealed itself after allowing the contents of the esophagus to escape into other areas of the body.

During the Appellee's six-week hospitalization in the intensive care unit, he was treated by Dr. Figueroa and Dr. Gabriele Al-Hajj. Because the Appellant was not involved in the care of the Appellee during the remainder of this hospitalization, the specifics of that period need not be addressed.

In December 1988, the Appellee initiated a civil action alleging medical malpractice. During the course of discovery, the Appel-

1. Dr. Gabriel E. Al–Hajj, Dr. Edmundo E. Figueroa, and Dr. Henry Breland were defendants at trial. Dr. Breland is the only Appellant in this matter.

lee identified Dr. John Wilson and Dr. William Campbell as expert witnesses who would testify that the Defendants failed to meet the standard of care required by their fields of medicine. Prior to trial, the hospital settled with the Appellee for $47,000, and the Appellee therefore elected not to call Dr. Campbell, the expert who would have testified as to the hospital's actions.

During trial, Dr. Breland's counsel attempted to establish Thomas Memorial's negligence, based upon the difficulties encountered during the performance of the barium swallow test in the radiology department. Dr. Breland now contends, however, that the lower court impermissibly limited argument regarding Thomas Memorial's negligence and failed to inform the jury of Thomas Memorial's settlement with the Appellee.

Dr. Breland also asserts that the lower court erred in permitting Dr. John Wilson to testify as an expert regarding the appropriate standard of care in the field of emergency medicine. Dr. Wilson, a general surgeon, was the only witness called at trial who testified that Dr. Breland breached the standard of care in his treatment of the Appellee.[2] Dr. Breland moved, pursuant to West Virginia Code § 55–7B–7 (1986), to prohibit Dr. Wilson from testifying regarding the appropriate standard of care for an emergency physician since Dr. Wilson had not worked in an emergency room other than to perform surgeries when requested by emergency medical physicians. Despite the contentions of Dr. Breland, the lower court allowed Dr. Wilson to testify regarding the standard of care for emergency medical physicians.

Dr. Breland also contends that the lower court erred in failing to grant him a directed verdict or a judgment notwithstanding the verdict when the Appellee failed to establish that any negligence of Dr. Breland caused the Appellee's injuries. Dr. Breland argues that even the Appellee's expert testified that had the test been properly administered, it was possible that the Appellee would not have suffered any injury.

## II.

The Appellant contends that the lower court impermissibly limited evidence regarding Thomas Memorial's negligence and the role such negligence might have played in the Appellee's injuries. The Appellant asserts that based upon testimony regarding the fact that the Appellee's perforation occurred while in the radiology department, counsel for the Appellant sought to argue that Thomas Memorial was solely responsible for the Appellee's injuries. The Appellee, however, alleges that Dr. Breland's defensive trial strategy included an attempt to present a scenario in which no particular Defendant was at fault for the incident. This classic defense, as the Appellee characterizes it, was based on the contention that no health care provider, including Thomas Memorial, had deviated from the normal standard of care. Furthermore, the Appellee contends that the lower court did allow evidence of Thomas Memorial's fault to be introduced. For example, evidence of Thomas Memorial's fault in the radiology department was introduced through cross-examination of Dr. Wilson. Dr. Wilson explained that it was the administration of the barium swallow test in the radiology department which caused the perforation in the Appellee's esophagus.[3] The deposition of Dr. Camp-

**2.** The Appellee contended that had Dr. Breland not ordered a barium swallow test, no malpractice action would have been brought. The proper procedure, as advanced by the Appellee, would have been a bronchoscopy after a plain chest x-ray to identify any blockage.

**3.** Counsel for Dr. Breland questioned Dr. Wilson regarding Thomas Memorial's standard of care as follows:

Q: That's my question. What caused the perforation was the retching and vomiting, as far as you can tell, back in radiology, wasn't it?
A: That part is true, yes sir.
Q: It wasn't caused out there when Dr. Breland examined the patient.
A: I understand.
Q: He was fine when he went back there to radiology; is that correct?
A: That's my understanding right.

bell was also read into evidence, indicating that Dr. Campbell was critical of Thomas Memorial's administration of the barium. Additionally, counsel for Dr. Breland discussed Thomas Memorial's role in his opening statement and questioned the Appellee himself during cross-examination regarding his experience in the radiology department.[4]

Prior to opening statements, the lower court explained the following to the parties:

> Don't get into this thing about pointing the finger at Thomas because they're not in this case. They're not in the case. And the only way I'm going to let them in the case is just by telling the jury that they were in the case and they settled. And the jury can make any inference they want from the evidence that comes in, but I don't want you all arguing that.

Yet at no time did the lower court prevent Dr. Breland's counsel from making a specific argument or statement regarding Thomas Memorial's negligence. Nor did Dr. Breland's counsel make any objection at trial to any ruling or statement of the lower court which could have been interpreted as limiting the evidence to be presented regarding Thomas Memorial's negligence. The lower court specifically informed counsel for Dr. Breland, immediately preceding closing arguments, that he would be permitted during closing to

> get into the facts upon which Thomas' negligence was based, based on the testimony. I think you developed it well dur-

ing the first part of the case primarily, and I'm not going to shortchange you to the extent that your clients weren't responsible or negligent for certain things that happened to this guy.

Based upon our review of the record, we believe that all defendants were provided ample opportunity to explain the negligence of Thomas Memorial Hospital. Counsel for Dr. Breland appears to have refrained from emphatic argument of Thomas Memorial's negligence and did not offer an expert witness to testify regarding Thomas Memorial's deviation from the standard of care. We do not believe that the presentation of Dr. Breland's case was impeded by any action or limitation of the lower court regarding the scope of argument as to Thomas Memorial's negligence. Furthermore, we are not convinced that the lower court's initial admonishment regarding refraining from "pointing the finger" at Thomas Memorial, when viewed in conjunction with the evidence permitted to be introduced as to Thomas Memorial was perceived by the Appellant as an appreciable limitation on the presentation of his defense. Otherwise, an objection (or at least a request for clarification) would have been made, and the Appellant would not have proceeded to elicit such evidence and make such argument.

### III.

■ Dr. Breland also contends that the lower court erred by refusing to inform

---

> Q: Do you believe the standard of care was breached in administering the barium swallow itself, not in ordering?
>
> A: I believe giving it, per se, was below the standard, which I've already stated.
>
> Q: You already stated that?
>
> A: Yes. The order is below the standard; to give it is below the standard, to drown him is below the standard. How meaningful it was, I don't know, but those are certainly bad things to do.

4. During his opening, counsel for Dr. Breland, without interruption by the lower court or opposing counsel, stated as follows:

> In this case, Dr. Breland sent Mr. Fortney back there to radiology, and everyone is going to agree on everything up until that point. Dr. Breland sent him back there to have him take a couple sips of barium. Dr. Breland did not go back with him to do that. Dr. Breland

doesn't administer those tests, and he'll tell you that. He was out there caring for patients in the emergency room. He sent him back to radiology. And then Mr. Fortney can be the only one that can tell us about what happened back there in radiology, and he's going to tell you a horrible story.

> People back at Thomas Memorial Hospital back in radiology gave him a sip of barium; kept having him sip more and more and more. He'll tell you that it was coming out of his mouth and going all over his clothes. He'll tell you that he was gagging, and he had a real problem back there in radiology; but remember, Dr. Breland is not giving that test back there. He decided that that's the appropriate test, but he sent him back there to have it done by the radiology staff at Thomas Memorial Hospital, and Mr. Fortney is going to be the one that will tell you about what happened back there.

the jury of the hospital's settlement with the Appellee. We have consistently held that the question of whether to inform a jury of a settlement is clearly within the discretion of the trial court. *Grillis v. Monongahela Power Co.*, 176 W.Va. 662, 346 S.E.2d 812 (1986). In syllabus point 2 of *Grillis*, we explained the following:

In the absence of a particularized showing on the part of the remaining parties to a suit that one or more of them will suffer prejudice if the trial court fails to advise the jury of the dismissal of one or more parties to the suit, or that another party has taken an unfair advantage of the dismissal in its presentation and argument of the case, there is no duty on the trial court to so instruct the jury regarding the dismissal of a party from the suit.

*Id.* at 665, 346 S.E.2d at 813–14.

Furthermore, in *Groves v. Compton*, 167 W.Va. 873, 880, 280 S.E.2d 708, 712 (1981), we concluded:

In regard to informing the jury as to the dismissal of the party who has settled, we do not believe that any fixed rule can be set except to state that neither counsel should be permitted to take unfair advantage of the settlement and dismissal in presenting and arguing their case.

We also stated the following in syllabus point 2 of *Groves:*

In the absence of a written stipulation by the parties, the better rule is to leave the question of the manner of handling the offset occasioned by the settlement by a joint tortfeasor, as well as the manner of informing the jury that such party has been dismissed from the lawsuit, to the sound discretion of the trial court.

*Id.* at 873, 280 S.E.2d at 709.

The lower court decided not to inform the jury of the fact that Thomas Memorial had previously entered into a settlement with the Appellee. This decision, in our view, is well within the discretion we have previously provided to ruling courts. We explained the following in *Groves:*

There are two basic methods available for utilizing the offsetting settlement figure. The jury may be informed of the settlement figure before it retires to deliberate and instructed that if it finds a verdict for the plaintiff, it should deduct from the verdict the settlement amount. The other approach is to refrain from disclosing the settlement amount to the jury and upon their return of a verdict awarding damages the trial court deducts the settlement figure from the award before entering the judgment.

*Id.* at 880, 280 S.E.2d at 712.

The lower court in the present case simply chose the second option. Full monetary credit was given to Dr. Breland for the amount of Thomas Memorial's settlement. We do not believe that the lower court abused its discretion in this regard.

## IV.

Dr. Breland further asserts that the lower court erred in permitting Dr. Wilson to testify as an expert witness due to his lack of experience in emergency room procedure. In *Gilman v. Choi*, 185 W.Va. 177, 406 S.E.2d 200 (1990), we addressed the relationship between West Virginia Rule of Evidence 702, regarding expert testimony generally, and West Virginia Code § 55–7B–7, regarding competency of expert witnesses in a medical malpractice action.

" 'Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused.' Point 5, syllabus, *Overton v. Fields*, 145 W.Va. 797, [117 S.E.2d 598 (1960)]." Syllabus Point 4, *Hall v. Nello Teer Co.*, 157 W.Va. 582, 203 S.E.2d 145 (1974). Syl.Pt. 12, *Board of Educ. v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990).

West Virginia Code § 55–7B–7 enumerates specific requirements regarding expert testimony in a medical malpractice action and provides as follows:

The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in

medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that: (a) The opinion is actually held by the expert witness; (b) the opinion can be testified to with reasonable medical probability; (c) such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (d) such expert maintains a current license to practice medicine in one of the states in the United States; and (e) such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider.

It is primarily with subdivision (e) of West Virginia Code § 55–7B–7 that Dr. Breland takes issue. Thus, we must determine whether Dr. Wilson was "engaged or qualified in the same or substantially medical field" as Dr. Breland. In *Gilman*, we explained the following:

> In this regard it would be an abuse of discretion for a trial court to require the proffered expert witness to be board certified in the same medical specialty as a particular defendant health care provider. *W. Va. Code*, 55–7B–7 [1986] does not impose such a requirement.... If the legislature had intended such a board certification requirement, it could have provided explicitly therefor, as, for example, the legislature of Florida did in enacting *Fla. Stat. Ann.* § 766.102 (West 1988).

*Id.* 185 W.Va. at 180, 406 S.E.2d at 203.

In the present case, Dr. Breland did have an internship in general surgery, but he was not a board certified emergency room physician. Dr. Wilson was a board certified general surgeon with over fifteen years of experience as chairman of an emergency room department, including the review of emergency room standard of care issues. Dr. Wilson also testified that he had handled several impacted food cases

throughout his career. He had also performed several surgeries in an emergency room context, although he had never actually practiced emergency medicine. The Appellee correctly emphasizes that we are presently confronted with an issue of standard of care for a physician evaluating and treating an impacted food case, not simply the general emergency room physician's standard of care.

> We explained the following in *Gilman:*
> [A] medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which his or her testimony is offered; on the other hand, it is clear that a medical expert may not testify about any medical subject without limitation.

*Id.* at 181, 406 S.E.2d at 204. While Dr. Breland was indeed practicing in the emergency room, it must be acknowledged that the medical subject we are concerned with is not simply the general practice of medicine, but rather the specific issue of treatment of patients with blockages of the nature of that suffered by the Appellee. Consequently, the emphasis must be on whether the proffered expert, Dr. Wilson, had the requisite experience to testify with regard to that latter issue. While Dr. Wilson only practiced in an emergency room setting when specifically needed for surgery, he had handled many impacted food cases during his career.

As Justice Neely noted in his partial dissent and concurrence to *Gilman*, "[a] physician does not necessarily need to be 'board certified' in a medical field in order to work in that medical field." *Id.* at 182, 406 S.E.2d at 205 n. 1. A physician's experience may qualify him to testify regarding areas other than his board certified specialty. The fact that a testifying expert physician may not have precisely the same specialty as a physician defendant does not disqualify that testifying physician as an expert regarding the standard of care to be employed by the physician defendant. By emphasizing the fact that Dr. Wilson had not actually practiced emergency medicine, Dr. Breland is hedging the

issue slightly. The salient inquiry is to what extent Dr. Wilson is qualified under West Virginia Code § 55–7B–7 to testify as an expert on the issue of Dr. Breland's standard of care in treating a patient suffering an impacted food blockage. Based upon the foregoing, we conclude that Dr. Wilson was qualified to provide expert testimony on the issue of the standard of care of a physician rendering assistance to a patient suffering from an impacted food blockage. Any shortcomings which the Appellant believed existed in Dr. Wilson's credentials could have properly been the subject of cross-examination.

## V.

■ Dr. Breland has also asserted that the Appellee failed to prove causation and that, consequently, Dr. Breland's motion for a directed verdict or a judgment notwithstanding the verdict should have been granted. Dr. Breland appears to base this contention upon the fact that the only actual evidence of causation was introduced through the Appellee's expert, Dr. Wilson. Dr. Breland contends that Dr. Wilson's testimony should not have been permitted, and he asserts that the causation issue addressed by Dr. Wilson should therefore be accorded no credence.

■ In evaluating a motion for a directed verdict or judgment notwithstanding the verdict, we have previously explained that a court should not grant the motion or disturb a jury verdict where the evidence is conflicting. In syllabus point 2 of *Rhodes v. National Homes Corp.*, 163 W.Va. 669, 263 S.E.2d 84 (1979), we explained:

" 'Where, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong.' Point 2, Syllabus,

*French v. Sinkford*, 132 W.Va. 66[,] [54 S.E.2d 38] [1948]." Syllabus Point 6, *Earl T. Browder, Inc. v. County Court*, 145 W.Va. 696, 116 S.E.2d 867 (1960).

With regard to whether Dr. Breland deviated from the normal standard of care in his treatment of the Appellee, the following dialogue during Dr. Wilson's testimony is relevant:

Q: Dr. Wilson, I guess maybe the best thing to do after all that is I will go back to my question. Do you have an opinion, based upon a reasonable degree of medical probability, through your experience and training, as you indicated, whether or not Dr. Breland deviated from the normal standard of care in his treatment of Mr. Fortney?

A: I have an opinion.

Q: What is your opinion?

A: I believe that he did.

The Appellee, through Dr. Wilson's testimony, presented evidence of Dr. Breland's breach of the standard of care. We have determined that the testimony of Dr. Wilson as an expert was permissible under West Virginia Code § 55–7B–7 and was properly presented to the jury. Moreover, the issue of Dr. Breland's conduct became a contested issue, formed a conflict in the evidence as presented by the opposing parties, and established the basis for resolution by a jury.

Based upon the foregoing, the decision of the Circuit Court of Kanawha County is affirmed.

Affirmed.