454 S.E.2d 87

Roberta MAYHORN, as Executrix of the Estate of Homer Mayhorn, Plaintiff Below, Appellant,

v.

LOGAN MEDICAL FOUNDATION, a corporation, dba Logan General Hospital; and Dr. Jim Gosien, M.D., Defendants Below, Appellees.

No. 21933.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1994.

Decided Dec. 9, 1994.

Dissenting Opinion of Justice Neely Dec. 12, 1994.

Thomas A. Zamow, Logan, for appellant.

George L. Partain, Logan, for appellee Logan Medical Foundation.

William L. Mundy, Mundy & Adkins, Huntington, for appellee Dr. Jim Gosien, M.D.

McHUGH, Justice:

The appellant, Roberta Mayhorn, filed a medical malpractice wrongful death action pursuant to *W.Va.Code*, 55–7–5 [1931] and 55–7B–1, *et seq.* against the appellees, Logan Medical Foundation, d/b/a Logan General Hospital (hereinafter "the hospital") and Jim Gosien, M.D. The appellant filed this appeal after the Circuit Court of Logan County granted the appellees' motion for a directed verdict on the ground that the appellant's expert, Gordon Bendersky, M.D., relied on a certain fact not in evidence when rendering his opinion which the trial judge found was later shown to be incorrect during the testimony of C.F. DeLara, M.D. For reasons stated below, we reverse the circuit court.

I

This action arose after the appellant's husband, who was sixty-eight years old, went to the emergency room at approximately 11:55 p.m. on June 19, 1990, with complaints of sharp pains between his shoulder blades which traveled down his left arm. Mr. Mayhorn also complained of belching, but denied being short of breath or having excessive perspiration.

The emergency room physician, Dr. Gosien, ordered an electrocardiogram (EKG) and other cardiac work-up tests which allegedly revealed no abnormalities. At approximately 1:10 a.m., on June 20, 1990, Dr. Gosien discharged Mr. Mayhorn after diagnosing him with non-cardiogenic pain which was possibly indigestion. Dr. Gosien gave Mr. Mayhorn a "GI cocktail" (Maalox and Donnatol) to treat his symptoms. At approximately 8:55 a.m. on the same day, while in his home, Mr. Mayhorn suffered a cardiac arrest and

was sent, by ambulance, to the hospital where he died at approximately 10:15 a.m.

Dr. Carlos DeLara, a pathologist who worked for the appellee hospital, performed an autopsy which was limited to the heart and lungs at the appellant's request. Dr. DeLara concluded the following: "This elderly white male died suddenly of cardiac arrhythmias brought about by severe arteriosclerosis of the coronary arteries. No evidence of recent myocardial infarction is noted." [1]

On August 5, 1991, the appellant filed a wrongful death action against the appellees. At trial the appellant used Gordon Bendersky, M.D., a board certified internist, as her expert witness on Mr. Mayhorn's cause of death and on the standard of care which Dr. Gosien should have used. The trial court allowed Dr. Bendersky to testify as to the cause of Mr. Mayhorn's death before Dr. DeLara testified even though Dr. Bendersky relied on Dr. DeLara's autopsy report. Dr. Bendersky also relied on the emergency room report and test results and a past EKG performed by Mr. Mayhorn's treating physician in forming his opinion. Dr. Bendersky did not examine the body. Dr. Bendersky testified that "[t]he cause of death was preventable arrhythmia caused by acute myocardial ischemia."

Dr. DeLara testified that in his report he did mention that Mr. Mayhorn had evidence of ischemia; however, it was not recent ischemia. Furthermore, Dr. DeLara testified that he could not state the cause of death with a reasonable degree of medical certainty. He stated that he could only make an educated guess as to the cause of death.

The trial court granted the appellee's motion for a directed verdict after hearing Dr. DeLara's testimony that there was no evidence of any recent ischemia. It is from this ruling that the appellant appeals.

## II

The issue raised by the appellant involves the admissibility of the testimony of a medical doctor who bases his opinion on the cause of death on a pathology report which has been admitted into evidence. The trial judge ruled that the medical doctor's testimony was not admissible pursuant to *West Virginia Rules of Evidence* 703 since the author of the pathology report disagreed with the findings the medical expert made from that report. The dispute centers on whether Dr. DeLara's autopsy report noted recent ischemia and on whether there are other factors on which Dr. Bendersky based his opinion other than a finding of recent ischemia.

At the outset, we point out that this Court has stated in *Belcher v. Norfolk and Western Ry. Co.*, 140 W.Va. 848, 853, 87 S.E.2d 616, 620 (1955), *overruled on other grounds, Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), that when a verdict is directed in favor of the defendants, then the evidence introduced by the plaintiffs must be taken as true along with all facts which are favorable to the plaintiff which may be inferred from the evidence. Therefore, when analyzing the issues in the case before us, we will interpret the facts in the light most favorable to the appellant. Additionally, we are mindful that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. pt. 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991), *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244. (1991)

The Supreme Court of the United States has explained how a trial judge should analyze the admissibility of an expert's opinion:

> Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applica-

---

1. Although this footnote by no means completely describes the medical conditions discussed in the case before us, it does attempt to explain in general terms what some of the medical conditions are. A myocardial infarction is gross cell death in the myocardium (which is the middle thick layer of the heart wall which is composed of heart muscle) as a result of interruption of blood supply to the area. *The Sloane–Dorland Annotated Medical–Legal Dictionary* 374 and 471 (1987). A myocardial ischemia is caused by the deficiency of blood supply to the heart muscle due to constriction or obstruction of the coronary artery. *Id.* at 390.

ble rules. Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing. Finally, Rule 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....'

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, —, 113 S.Ct. 2786, 2797–98, 125 L.Ed.2d 469, 484 (1993). Therefore, when analyzing the first issue, we must first determine whether Dr. Bendersky relied on facts and data which are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" pursuant to *W.Va. R.Evid.* 703. Second, we must determine whether that expert's testimony is admissible pursuant to *W.Va.R.Evid.* 702, and third, we must determine whether the testimony was more prejudicial than relevant pursuant to *W.Va.R.Evid.* 403. We will, therefore, begin our discussion with an analysis of the applicable rules of evidence.

■ *W.Va.R.Evid.* 703 simply outlines the factual basis which an expert may use to form his opinion:

**Bases of Opinion Testimony by Experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Specifically, Rule 703 allows an expert to base his opinion on "(1) personal observations; (2) facts or data, admissible in evidence, and presented to the expert at or before trial; and (3) information otherwise inadmissible in evidence, if this type of information is reasonably relied upon by experts in the witness' field." 2 Franklin D. Cleck-

ley, *Handbook on Evidence for West Virginia Lawyers*, § 7–3(B) (3rd ed. 1994). *See also* Advisory Committee Notes of *Fed. R.Evid.* 703.

■ Courts have interpreted Rule 703 to allow experts to rely on the reports and observations of others even though this might mean the expert is basing his opinion on hearsay. 3 Jack B. Weinstein et al., *Weinstein's Evidence* § 703[01] at 703–11 (1994). The purpose of Rule 703 is to enable experts to give opinions in a manner consistent with how they make decisions without having to go through the time-consuming process of introducing the mass of information that forms the basis of an expert's opinion. After all, it is "[t]he expert's opinion, rather than the underlying unadmitted hearsay, [which] constitutes the primary evidence, [and] which the jury can evaluate only on the basis of the expert's credentials and the usual credibility factors." Cleckley, *supra* § 7–3(B)(2) at 51.

■ *W.Va.R.Evid.* 702 states:

**Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

*W.Va.R.Evid.* 702 provides the test for determining whether an expert's testimony is admissible. More pointedly, in syllabus point 2 of *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, — U.S. —, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), this Court held:

In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes

an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

In arriving at this conclusion, this Court relied upon *Daubert, supra,* in which the Supreme Court of the United States made clear that, when determining whether the expert's opinion has a reliable foundation and whether the expert's opinion is relevant to the issue before the trial court, the trial judge's "focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.[2]

In light of the foregoing analysis, we now turn to the case before us. The appellees argue that Dr. Bendersky based his opinion on a fact not in evidence: recent ischemia. Conversely, the appellant argues that Dr. Bendersky based his opinion of the cause of death on several factors found in Dr. DeLara's report and not solely on Dr. DeLara's finding of ischemia.

A close reading of the record indicates that the appellant is correct. Dr. Bendersky, upon reviewing Dr. DeLara's report, noted that the following findings in the autopsy report are consistent with acute myocardial ischemia: pain in the left arm; pain within the shoulder blade; severe arteriosclerosis of the coronary arteries with a seventy percent narrowing of the lumen; narrowing of the circumflex artery; ischemic infarction of the papillary muscles; and death by cardiac arrhythmias. Clearly, Dr. Bendersky relied on more than Dr. DeLara's finding of ischemia in the papillary muscles when arriving at his opinion.[3] Additionally, the record indicates

**2.** The Supreme Court of the United States held in *Daubert, supra,* that the *Federal Rules of Evidence* supersede the "general acceptance" test established in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) which governed when the scientific technique used by the expert in forming his opinion was admissible. In *Daubert,* the Supreme Court of the United States outlined a flexible approach in which the trial court is to analyze whether the expert's opinion has a reliable foundation and whether the expert's opinion is relevant to the issue before the trial court. The Supreme Court of the United States noted that when the trial court is determining whether there is a reliable foundation for the expert's opinion, the trial court must assess whether the underlying reasoning or methodology is scientifically valid and properly applied. The Supreme Court of the United States emphasized that generally cross-examination, presenting contrary evidence and instructing on the burden of proof is the means to challenge the evidence (if it is based on valid principles) relied upon by the expert in forming his opinion rather than complete exclusion.

**3.** The following is an excerpt from the trial in which Dr. Bendersky testified as to how he formed his opinion:

Q. If you will, step down to the bench, sir. Mainly for the jury's edification, yesterday you discussed I guess what would be the first page of—Doctor, if you would, look at the first page of the pathology report and I'll hand you a marker here. Is there anything on the first page of that report that you can highlight that would indicate any findings consistent with a death caused by myocardial ischemia?

A. Yes. The pain in the left arm. It says here pain within the shoulder blade, but the patient says between the shoulder blades. Those are the two findings consistent with acute myocardial ischemia.

Q. Same thing on the second page. Is there any findings on the second page that would be consistent with a death caused by myocardial ischemia?

A. Yes. This says both the coronary arteries show some severe arteriosclerosis with narrowing of the lumen to approximately seventy (70) percent, and it describes it including the other blood vessels for a total of these three. So it says more pronounced on the left anterior descending branch. Circumflex artery also shows some narrowing. The yellowed portions are consistent with acute myocardial ischemia.

Q. Is there any findings on page 3 that would be consistent with a cause of death or death caused by myocardial ischemia?

A. Yes. The finding here is the ischemic infarction of the papillary muscles. Ischemic infarctions are present in the papillary muscles and several tubercula or ligaments connecting them. That indicates death from myocardial ischemia. In addition, there's the repeat information about the coronary arteries show severe arteriosclerosis and a marked narrowing to approximately seventy-five (75) percent.

Q. What was the lumen?

A. Lumen is the other name for the opening in the pipeline. It's the hole that the blood normally show [sic] flow through, but is narrowed in this case.

Q. Is there anything on I guess the comment page that would be consistent with the finding of a death by myocardial ischemia?

that Dr. Bendersky further relied on the emergency room report and test results, and a past EKG performed by Mr. Mayhorn's treating physician.

■ It defies logic to argue that a medical expert's reliance on an autopsy report, emergency room report and test results, as well as a past EKG performed by Mr. Mayhorn's treating physician, are not data a medical expert would reasonably rely upon when determining the cause of death pursuant to *W.Va.R.Evid.* 703. Furthermore, in that the basic methodology employed by Dr. Bendersky was scientifically valid, it would be inappropriate to exclude his testimony pursuant to *W.Va.R.Evid.* 702 as being irrelevant scientific knowledge which would not assist the jury. Therefore, the fact that Dr. Bendersky's conclusion differed from that of the author of the pathology report does not render Dr. Bendersky's testimony inadmissible pursuant to *W.Va.R.Evid.* 702. As we stated previously, the focus must be solely on the methodology and not on the opinion of the expert, as it is the jury who is responsible for determining the weight to be given to the expert's opinion. Furthermore, pursuant to *W.Va.R.Evid.* 403, because Dr. Bendersky's testimony is necessary in determining whether medical malpractice has occurred, "its probative value is substantially outweighed by the danger of unfair prejudice[.]"

■ Accordingly, we hold that pursuant to *W.Va.R.Evid.* 702 an expert's opinion is admissible if the basic methodology employed by the expert in arriving at his opinion is scientifically or technically valid and properly applied. The jury, and not the trial judge, determines the weight to be given to the expert's opinion. Therefore, in the case before us, it was proper for the testifying expert to base his opinion on the report of another expert, even though the author of the report came to a different conclusion than the testifying expert, since the basic methodology employed by the testifying expert was scientifically valid and properly applied. Furthermore, the expert did not base his opinion solely on the pathology report. The expert also relied upon an emergency room report and test results as well as a past EKG when forming his opinion. Thus, the trial judge was clearly wrong when he found Dr. Bendersky's testimony to be inadmissible.

### III

■ The appellee, the Logan Medical Foundation, raises a cross-assignment of error. The issue raised by the Logan Medical Foundation is whether Dr. Bendersky, pursuant to *W.Va.Code,* 55–7B–7 [1986], is sufficiently "engaged or qualified in the same or substantially similar medical field" as Dr. Gosien to be qualified as an expert in a medical malpractice action. We have clearly outlined the standard used by this Court when reviewing a trial court's decision to qualify an expert:

> ' " 'Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused.' Point 5, syllabus, *Overton v. Fields,* 145 W.Va. 797 [117 S.E.2d 598 (1960)]." Syllabus Point 4, *Hall v. Nello Teer Co.,* 157 W.Va. 582, 203 S.E.2d 145 (1974).' Syllabus Point 12, *Board of Education v. Zando, Martin & Milstead,* 182 W.Va. 597, 390 S.E.2d 796 (1990).

Syl. pt. 3, *Wilt, supra.* Therefore, we will not reverse the trial court's decision, in the case before us, unless the appellee can show that the trial court clearly abused its discretion.

The appellee focuses its attention on the following language found in *W.Va.Code,* 55–7B–7 [1986], which states, in relevant part:

> The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if re-

---

A. Yes, there is. The statement in the comments, elderly white male died suddenly of cardiac arrhythmias. Cardiac arrhythmias are the characteristic way of acute myocardial ischemia causing death, and the repeat statement of the severe arteriosclerosis of the coronary arteries. That supports the cause of death as acute myocardial ischemia.

quired by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that: ... (e) such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider.

This Court in *Gilman v. Choi*, 185 W.Va. 177, 406 S.E.2d 200 (1990) discussed the above statutory provision. In *Gilman* this Court stated that pursuant to *W.Va.R.Evid.* 601, the legislature could enact statutes which concern the competency of witnesses.[4] Therefore, the Court in *Gilman* concluded that the legislature could enact *W.Va.Code,* 55–7B–7 [1986] which outlines the qualifications of an expert in a medical malpractice case; however, this Court declined to address whether *W.Va.Code,* 55–7B–7 [1986] is more restrictive than *W.Va.R.Evid.* 702, which governs when an expert is qualified to state an opinion.

 Today we revisit the reasoning of the *Gilman* decision. There is a difference between the competency of a witness, which is governed by *W.Va.R.Evid.* 601, and the qualifications of an expert, which is governed by *W.Va.R.Evid.* 702. Cleckley, *supra* § 7–2(A)(1) at 30. Furthermore, *W.Va.R.Evid.* 601 should not be used to allow the legislature to outline when an expert is qualified. *Id.* Instead, the applicable provision is *W.Va.R.Evid.* 702, which provides:

> **Rule 702. Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a *witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.*

(emphasis added). *W.Va.R.Evid.* 702 does not provide that the legislature may outline when a witness should be found to be qualified as an expert. This Court has complete authority to determine an expert's qualifications pursuant to its constitutional rule-making authority. *See W.Va. Const.* art. VIII, § 3 (which states, in relevant part, that the

Supreme Court of Appeals of West Virginia "shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law.") and syllabus point 1, *Bennett v. Warner*, 179 W.Va. 742, 372 S.E.2d 920 (1988) ("Under article [VIII], section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure, which shall have the force and effect of law.") *See also* Cleckley, *supra* § 7–2(A)(1), at 30. Additionally, this Court recently held that "[t]he West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts. These rules constitute more than a mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them." Syl. pt. 7, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). *See also Teter v. Old Colony Co.*, 190 W.Va. 711, 724, 441 S.E.2d 728, 741 (1994).

 Accordingly, we hold that Rule 702 of the *West Virginia Rules of Evidence* is the paramount authority for determining whether or not an expert is qualified to give an opinion. Therefore, to the extent that *Gilman v. Choi*, 185 W.Va. 177, 406 S.E.2d 200 (1990) indicates that the legislature may by statute determine when an expert is qualified to state an opinion, it is overruled. With this in mind, we will now analyze the issue before us under *W.Va.R.Evid.* 702.

The *Gilman* case analyzed Rule 702, and provided guidance on when a medical expert is qualified to testify in a malpractice case:

> First, a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which his or her testimony is offered; on the other hand, it is clear that a medical expert may not testify about any medical subject without limitation.... Second, ... [in order] to qualify a witness as an expert on

---

4. *W.Va.R.Evid.* 601 states: "Every person is competent to be a witness except as otherwise pro-

vided for by statute or these rules."

that standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty....

Third, a medical witness may acquire sufficient knowledge to qualify as an expert through practical experience, recent formal training and study or a combination of these factors.

*Gilman,* 185 W.Va. at 181, 406 S.E.2d at 204 (citations omitted and emphasis in original text). Lastly, we point out in *Gilman* that this Court stated "it would be an abuse of discretion for a trial court to require the proffered expert witness to be board certified in the same medical specialty as a particular defendant health care provider." *Id.* at 180, 406 S.E.2d at 203.

This Court applied the discussion in *Gilman* regarding Rule 702 of the *W.Va.R.Evid.* to *Fortney v. Al–Hajj,* 188 W.Va. 588, 425 S.E.2d 264 (1992). In *Fortney,* a case factually similar to the case before us, this Court found that the expert, who was not board certified in emergency room medicine, was qualified to testify as to the standard of care of an emergency room physician. This Court in arriving at that decision noted that the expert was a board certified general surgeon with fifteen years of experience as a chairman of an emergency room department. Ad-

ditionally, this Court recognized that the medical issue (a perforated esophagus due to impacted food) involved specialized knowledge which the expert had, and not just mere knowledge of emergency room procedures. *Id.*

■ Similarly, in the case before us, Dr. Bendersky, who is board certified in internal medicine, is a professor of cardiology at Hahnemann University Medical School. Therefore, Dr. Bendersky possesses specific knowledge about the medical condition at issue in the case before us. Additionally, Dr. Bendersky testified that from approximately 1959 until 1966 he worked full-time in the emergency room. Dr. Bendersky also testified that although he no longer works full-time in the emergency room, he continues to see patients in the emergency room when he is called in to examine them for cardiology problems.

■ The appellee challenged the truth of Dr. Bendersky's testimony; however, the trial court was aware of the appellee's concerns when it made its decision. Moreover, if the appellee had wanted to challenge the veracity of Dr. Bendersky's credentials it could have done so through cross-examination. Accordingly, we do not find that the trial court clearly abused its discretion when qualifying Dr. Bendersky as an expert.[5]

---

5. The appellee in a cross-assignment of error contends that the plaintiff never proved what the applicable standard of care was that Dr. Gosien breached. The appellee cites several cases including *Thornton v. CAMC,* 172 W.Va. 360, 305 S.E.2d 316 (1983). *Thornton* uses the following language: "if an out-of-state physician testifies about a 'standard [that] is uniform throughout the country; and, that he is familiar with that standard, his testimony is admissible in a malpractice case.' " *Id.* at 369, 305 S.E.2d at 325–26 (footnote omitted and *citing* syl. pt. 6, *Hundley v. Martinez,* 151 W.Va. 977, 158 S.E.2d 159 (1967) in which we virtually abandon the locality rule).

The appellee also cites to a treatise entitled *Health Care Law* which lists several sources which determine a professional standard. The sources are: (1) standards developed by accrediting agencies; (2) statutory provisions; (3) the prescriptions of various professional groups; (4) an institution's own rules and regulations; (5) expert views; and (6) the actual practices of health care institutions. Michael G. MacDonald, et al., *Health Care Law* § 11.02[3][a] (1994).

The appellee concludes his cross-assignment of error by asking this Court to specifically require Dr. Bendersky to identify a recognized source for the professional medical standards which he claims were breached.

We note that if an expert is qualified pursuant to *W.Va.R.Evid.* 702, then the expert should be allowed to testify. "Should the witness later fail to adequately define or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony. The trier of fact may then choose to discount the testimony." *Cleckley, supra* § 7–2(A)(1), at 28.

However, since we conclude from a review of the record that this issue was not adequately presented to the trial court for it to consider, we decline to further address this cross-assignment of error. *See* syl. pt. 1, *Shackleford v. Catlett,* 161 W.Va. 568, 244 S.E.2d 327 (1978) (" 'In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken.' Syllabus Point 1, *Mowery v. Hitt,* 155 W.Va. 103 [, 181 S.E.2d 334] (1971)").

## IV

We reverse the December 18, 1992 judgment order of the Circuit Court of Logan County and remand this case to the trial court for proceedings consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

NEELY, Acting C.J., dissents.

NEELY, Acting Chief Justice, dissenting.

(Filed Dec. 12, 1994)

I dissent to the holding of Syllabus Point 6 for reasons set forth in my dissent in *Gilman v. Choi*, 185 W.Va. at 182, 406 S.E.2d at 205 (1990).