300 S.E.2d 110

**James Ronald GAMBLE, et al.**

v.

**Morris G. MAIN, etc.**

**No. 15390.**

Supreme Court of Appeals of West Virginia.

Jan. 28, 1983.

Russell Jay Guthrie, McCamic & McCamic, Wheeling, for appellants.

Marc B. Chernenko, Barnes, Watson, Cuomo, Hinerman & Fahey, Wellsburg, for appellee.

MILLER, Justice:

The plaintiffs, James and Elizabeth Gamble, appeal from a final order of the Circuit Court of Brooke County denying their motion for a new trial. They contend that the trial court erred in refusing to instruct the jury on the theory of implied warranty of habitability or fitness in their suit against the builder of their home. They also argue that the trial court erred in giving the builder's instruction regarding his nonliability for undisclosed defects in soil conditions.

Many of the facts are not in dispute. In the fall of 1976, the Gambles contacted several home construction contractors, including the defendant Morris G. Main. They sought to have a home built on Brady's Ridge in Brooke County, and were willing to spend between $35,000 and $40,000. The Gambles had never previously been involved in constructing a residence, and had only a layman's understanding of the process of site selection and house construction. They sought Main's advice as to the suitability of the lot on Brady's Ridge as a homesite. The Gambles were contemplating purchasing the lot but had not done so when they and Main visited it. The lot was wooded and steeply sloped.

It is not disputed that Main advised the Gambles that the lot was suitable for a homesite and that Main determined the location of the proposed home inside the lot. Main's initial examination of the lot involved no tests of any kind, and consisted of a brief walk over part of the lot with the Gambles. Main asserts there was no indication of any slips or land movements on the lot at that time.

The Gambles purchased the lot, and on December 12, 1976, entered into a contract with Main for the construction of a home on the site for $40,500. Main subsequently constructed a home on the site in accordance with the specifications of the contract, and there is no allegation that the house is in any way defective. The dispute concerns the location of and the defective construction of the septic system, which included an absorption field.

The Gambles moved into the house in May of 1977. In April of 1978, they noticed a slip developing in the front yard of their residence and attendant seepage from the absorption field of their septic system. The Gambles called Main, who came to inspect the slip. Main did not offer to repair the slip, being of the opinion that it did not result from any defective construc-

tion done on the site, but, rather, that the slip was due to pre-existing natural forces.

On August 3, 1979, the plaintiffs filed suit, alleging that Main improperly installed their septic system, and improperly back graded their front yard around the septic system, which resulted in the aforementioned slip.

At trial, various opinions were offered as to the cause of the slip. It was generally accepted by all the parties, however, that the movement of the earth in the Gambles' front yard had seriously damaged their septic system.

The Gambles retained Johnson McKinley, a civil engineer and the president of a construction firm, as an expert witness. McKinley testified that prior to trial he had examined the site and made calculations based upon his measurements and observations. He stated that he was familiar with the State and county regulations regarding the installation of septic systems, having constructed several systems similar to the Gambles'. When asked whether or not the septic system as installed in the Gamble property was in compliance with State and county requirements, McKinley indicated that it was not. He also stated that the septic system and the rough back grading around it in the front yard were not accomplished in a "first class workmanlike manner" as required by the contract.[1] In McKinley's opinion, the slip in the Gambles' front yard was caused by a combination of improper compaction of fill material during rough back grading around the septic system and the improper installation of the septic system's absorption field, which contributed to the moisture content in the ground.

Main and his witnesses stated there were no observable defects in the soil where the septic system was installed. They disputed the plaintiffs' expert's theory that improper compaction existed. Their testimony was to the effect that in a proper installa-

1. One of the provisions in the contract stated: "The contractor agrees to perform or cause to be performed all labor and to purchase all materials whatsoever necessary to build to completion and make ready for occupancy the building herein described, by following all instructions and carrying out every detail of this contract and these specifications in a first-class workmanlike manner."

tion of a septic system the soil should not be compacted as this precludes proper drainage or percolation in the system. It was the defendant's view that the slip was due to pre-existing natural causes which the construction of the house and septic system in no way affected. Main also was of the opinion that the Gambles had not planted adequate vegetation to stabilize the front yard.

The trial judge refused Plaintiffs' Instruction No. 2 on the ground that its statement of the law was inapplicable to the facts of the case. This instruction presented the legal theory that Main had impliedly warranted the suitability of the Gambles' building site.[2]

In response to the Gambles' appeal, the contractor Main makes several arguments. First, he argues that there is no implied warranty of habitability in this jurisdiction in the sale or construction of a new home. Second, he asserts that even if such a warranty exists, it should not apply in this case because the lot had been purchased before Main started to build. Finally, Main asserts that where the lot has already been purchased by the homeowner, the builder should not be held liable for soil defects which are latent in the sense that they could not be discovered prior to or in the course of the construction.

In our recent case of *Thacker v. Tyree,* 171 W.Va. 110, 297 S.E.2d 885 (1982), we considered a related question and concluded that the vendor of real estate had a duty to disclose to the purchaser a material latent defect of which he was aware.[3] In note 2 of *Thacker,* we referred to the implied warranty of habitability as follows:

"Many courts have concluded that as to the builder-vendor of a home there is an implied warranty of fitness or habitability in connection with the sale of a home and have thereby excluded the applicability of the doctrine of *caveat emptor* to such sales. *E.g., Wawak v. Stewart,* 247 Ark. 1093, 449 S.W.2d 922 (1970); *Pollard v. Saxe & Yolles Dev. Co.,* 12 Cal.3d 374, 525 P.2d 88, 115 Cal.Rptr. 648 (1974); *Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966); *Petersen v. Hubschman Construction Co., Inc.,* [76 Ill.2d 31], 27 Ill.Dec. 746, 389 N.E.2d 1154 (1979); *Crawley v. Terhune,* 437 S.W.2d 743 (Ky.1969); *Banville v. Huckins,* 407 A.2d 294 (Me.1979); *McDonald v. Mianecki,* 79 N.J. 275, 398 A.2d 1283 (1979); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965); *Hartley v. Ballou,* 20 N.C.App. 493, 201 S.E.2d 712 (1974), *rev'd on other grounds,* 286 N.C. 51, 209 S.E.2d 776; *Jeanguneat v. Jackie Hames Constr. Co.,* 576 P.2d 761 (Okla.1978); *Yepsen v. Burgess,* 269 Or. 635, 525 P.2d 1019 (1974); *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972); *Lane v. Trenholm Bldg. Co.,* 267 S.C. 497, 229 S.E.2d 728 (1976); *Waggoner v. Midwestern Dev., Inc.,* 83 S.D. 57, 154 N.W.2d 803 (1967);

---

**2.** Plaintiffs' Instruction No. 2 stated:

"The Court instructs the jury that if you believe by a preponderance of the evidence that the defendant Main held himself out, expressly or impliedly as competent to undertake the contract for the preparation and construction of the residence on the site proposed, and that the Gambles had no particular expertise in the work contemplated, and furnished no plans, specifications, design, or blueprints for the preparation and construction of said residence on said site, and tacitly or specifically indicated their reliance on his expertise and skill *as a contractor in selection of the site for the purpose of construction, after making known to Main that the site was to be intended for use as a residence, then there is imposed as part of the contract a warranty or guaranty that the site was fit for those purposes.*

"The Court further instructs the jury that if from a preponderance of the evidence you believe that the Defendant Main breached this warranty and that the site was not fit for its intended use as a habitable residence then you should find for the plaintiffs, Mr. and Mrs. Gamble." (Emphasis added)

**3.** The single Syllabus of *Thacker, supra,* is:

"Where a vendor is aware of defects or conditions which substantially affect the value or habitability of the property and the existence of which are unknown to the purchaser and would not be disclosed by a reasonably diligent inspection, then the vendor has a duty to disclose the same to the purchaser. His failure to disclose will give rise to a cause of action in favor of the purchaser."

*Klos v. Gockel,* 87 Wash.2d 567, 554 P.2d 1349 (1976). However, this theory is not asserted in this case."

■ The basis for the judicial imposition of such an implied warranty has come about for several reasons. First, there is the recognition that in a building contract there is ordinarily an implied warranty that the construction will be done in a workmanlike manner and, consequently, the doctrine of *caveat emptor* does not apply. We acknowledged this law in *Thacker, supra* at 887:

"In the area of construction contracts, *caveat emptor* ordinarily does not apply, as there is general recognition that an implied warranty of fitness and workmanlike quality attaches to such contracts, as stated in 3A Michie's Jurisprudence *Building Contracts* § 4 (1976):

" 'In building and construction contracts it is implied that the building shall be erected in a reasonably good and workmanlike manner and when completed shall be reasonably fit for the intended purpose. Ordinarily a person undertaking a particular work impliedly agrees to exercise a degree of skill equal to the undertaking. So, in case a person holds himself out as specially qualified to perform work of a particular character there is an implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use.'

"*See also* Syllabus Point 5, *Southern Erectors, Inc. v. Olga Coal Co.,* W.Va. 223 S.E.2d 46 (1976); *cf. W. Bateson & Co. v. Baldwin Forging & Tool Co.,* 75 W.Va. 574, 84 S.E. 887 (1915); 17A C.J.S. *Contracts* § 329 (1963)."

After the implied warranty principle was developed in a construction contract context, courts next recognized that the same type of an implied warranty ought to be available to the purchaser of a new home even when the purchaser had no construction contract with the builder-vendor. The reasons for the extension of the warranty were perhaps best summarized by the New Jersey Supreme Court in *McDonald v. Mianecki,* 79 N.J. at 287–89, 398 A.2d at 1289–90:

"Tribunals have come to recognize that '[t]he purchase of a new home is not an everyday transaction for the average family[;] * * * in many instances [it] is the most important transaction of a lifetime.' *Bethlahmy v. Bechtel,* [91 Idaho at 67,] 415 P.2d at 710 .... Courts have also come to realize that the two parties involved in this important transaction generally do not bargain as equals. The average buyer lacks the skill and expertise necessary to make an adequate inspection.... Furthermore, most defects are undetectable to even the most observant layman and the expense of expert advise is often prohibitive.... The purchaser therefore ordinarily relies heavily upon the greater expertise of the vendor to ensure a suitable product ... and this reliance is recognized by the building trade....

"Aside from superior knowledge, the builder-vendor is also in a better position to prevent the *occurrence* of major problems.... As one court has stated, '[i]f there is a comparative standard of innocence, as well as of culpability, the defendants who built and sold the house were less innocent and more culpable than the wholly innocent and unsuspecting buyer.' *House v. Thornton,* [76 Wash.2d 428, 435–36, 457 P.2d 199, 204 (1969)].

"It is not in expertise alone that the builder-vendor is generally superior. In the vast majority of cases the vendor also enjoys superior bargaining position.... Standard form contracts are generally utilized and '[e]xpress warranties are rarely given, expensive, and impractical for most buyers to negotiate. Inevitably the buyer is forced to rely on the skills of the seller.' Comment, 'Extension of Implied Warranties to Developer-Vendors of Completed New Homes,' 11 Urb.L.Ann. 257, 260 (1976)." (Emphasis in original) (Citations omitted) [4]

---

**4.** Among the commentators cited in *McDonald v. Mianecki* as favoring the implied warranty of habitability or fitness are: Bearman, *Caveat Emptor in Sales of Realty—Recent Assaults*

Courts and commentators have also commented on the irony that protection is afforded a purchaser of personal property under the Uniform Commercial Code by an implied warranty of fitness (W.Va.Code, 46–2–315) no matter how modest the value, and yet without an implied warranty of habitability the purchaser of a new home may have no protection. *E.g., McDonald v. Mianecki*, 79 N.J. at 285, 298 A.2d at 288; *Humber v. Morton*, 426 S.W.2d 554, 561 (Tex.1968); *Haskell, supra*, at 633; *Roberts, supra*, at 835–36.

We also believe that the doctrine of an implied warranty of fitness on the sale of a new home by a builder-vendor is compatible with the implied warranty of habitability for leased premises and perhaps even more necessary from a public policy standpoint. *Teller v. McCoy*, 162 W.Va. 367, 253 S.E.2d 114 (1978); W.Va.Code, 37–6–30. *See also Conyers v. Molloy*, 50 Ill.App.3d 17, 19, 7 Ill.Dec. 695, 697, 364 N.E.2d 986, 988 (1977). There can be little doubt that the economic investment of the homeowner far exceeds that of the ordinary tenant.

A majority of the jurisdictions in this country extend some form of protection to the purchaser of a new home. The protection is usually an implied warranty of habitability or fitness which requires that the dwelling be constructed by the builder in a workmanlike manner and that the property be reasonably fit for its intended use of human habitation.[5] We adopt this view. In attempting a definition of the implied warranty, a number of courts use the terms "habitability" and "fitness" interchangeably, and also indicate that these mean that a house should be constructed in a workmanlike manner. *E.g., Hartley v.*

*Ballou*, 286 N.C. at 62, 209 S.E.2d at 783 ("[T]he dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner."); *Elderkin v. Gaster*, 447 Pa. at 128, 288 A.2d at 777 ("[T]he builder-vendor impliedly warrants that the home he has built ... is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended—habitation."); *McDonald v. Mianecki*, 79 N.J. at 293, 398 A.2d at 1292 ("[B]uilder-vendors do impliedly warrant that a house which they construct will be of reasonable workmanship and habitability ... that is reasonably fit for the purpose for which it was built—i.e. habitation."); *Tavares v. Horstman*, 542 P.2d 1275, 1282 (Wyo.1975) ("[T]he sale carries with it an implied warranty that it is constructed in a reasonably workmanlike manner and is fit for habitation."); *Yepsen v. Burgess*, 269 Or. at 641, 525 P.2d at 1022 ("... a warranty that the house is constructed in a reasonably workmanlike manner and is fit for habitation.").

In the present case, we need not explore in depth all of the ramifications of the doctrine of the implied warranty of habitability or fitness except to say that it does exist in this State.[6] However, we do not believe that the trial court erred in refusing to give Plaintiffs' Instruction No. 2,[7] because it did not accurately state the law. The implied warranty of habitability or fitness does not extend to soil conditions which the builder is unaware of or could not have discovered by the exercise of reasonable care.

---

*Upon the Rule*, 14 Vand.L.Rev. 451 (1961); Haskell, *The Case for an Implied Warranty of Quality in Sales of Real Property*, 53 Geo.L.J. 633 (1965); Roberts, *The Case of the Unwary Home Buyer: The Housing Merchant Did It*, 52 Cornell L.Q. 835 (1967); Note, *Expansion of Consumer Protection in the Purchase of New Homes*, 3 W.St.U.L.Rev. 106 (1975); Comment, *Extension of Implied Warranties to Developer-Vendors of Completed New Homes, supra.*

**5.** In addition to the cases cited in note 2 of *Thacker, supra*, and quoted herein at 5, *see* Annot., 25 A.L.R.3d 383 (1969).

**6.** Most courts have held that an implied warranty does apply in situations involving a "small" builder-vendor. *E.g., Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Sup.Ct.Mo.1972); *McDonald v. Mianecki, supra; Hartley v. Ballou, supra; Lane v. Trenholm Building Co., supra; Bolkum v. Staab*, 133 Vt. 467, 346 A.2d 210 (1975). We do not extend the warranty to the homeowner who builds his own house and sells it on a nonrecurring basis.

**7.** *See* note 2, *supra.*

In most cases involving adverse soil conditions that affect the habitability, fitness or workmanlike construction of structures placed on the property by the builder, the courts have concluded that the builder was chargeable with knowledge of the adverse soil conditions and did not take proper corrective measures. In *Bethlahmy v. Bechtel, supra,* the contractor built on a lot which contained an unsealed irrigation ditch running beneath part of the newly-constructed house. It was shown at trial that water seeped from the drainage ditch during the irrigation season and percolated through the soil surrounding the plaintiff's basement, causing it to flood. The court, after an extensive review of other authorities, found that the builder had knowledge of this condition and therefore breached the implied warranty of habitability.

In *Waggoner v. Midwestern Dev., Inc., supra,* the builder had constructed a home on a lot which contained a spring-fed pond on which he had placed fill. During periods of rain, water would seep into the basement of the home. The plaintiff-homeowner's evidence was that the underground springs raised the water level so that when it rained flooding of the basement resulted. The court found that the builder was liable for breach of an implied warranty.

In some cases the soil condition is mentioned and the courts find the builder responsible without articulating the reasons, although it is clear that the contractor had knowledge of the defective soil conditions. *E.g., Tavares v. Horstman, supra* (septic system improper because built in tight gumbo soil which caused it to clog); *Griffin v. Wheeler-Leonard & Co., Inc.,* 290 N.C. 185, 225 S.E.2d 557 (1976) (lack of porosity in soil and failure to adequately drain around foundation); *Dixon v. Ledbetter,* 262 Ark. 758, 561 S.W.2d 294 (1978) (failure to compact fill dirt under driveway).[8]

The fact that the homeowners selected the building site does not necessarily relieve the builder of his obligation to make a reasonable inspection of the soil conditions encountered in his work and to disclose any soil defects to the owner. In *Luxurious Swimming Pools, Inc. v. Tepe,* 177 Ind. App. 384, 379 N.E.2d 992, 995 (1978), the contractor was held liable for the cracking of the walls of a swimming pool which resulted from the pool being installed on unstable soil: "Therefore, the fact that Tepe selected the pool site and, subsequently, had fill dirt dispersed in that area, will not, by itself, absolve Luxurious Pools of its liability for non-disclosure of a patently evident soil defect." *See also Lewis v. Anchorage Asphalt Paving Co.,* 535 P.2d 1188, 73 A.L.R.3d 1196 (Alaska 1975); *Dixon v. Ledbetter, supra; Sabella v. Wisler,* 59 Cal.2d 21, 377 P.2d 889, 27 Cal.Rptr. 689 (1963).

Much the same result has been achieved in construction contract cases, where the courts place a duty on a building contractor to advise the owner of soil defects that are known to him or by the exercise of reasonable care should have become known. *E.g., Lewis v. Anchorage Asphalt Paving Co., supra; Rippy v. Phipps,* 475 P.2d 646 (Colo.App.1970); Annot., 73 A.L.R.3d 1213 (1976).

As previously indicated, the cases involving soil defects and the implied warranty of habitability or fitness do not extensively discuss whether the defects were latent and could not have been discovered by the exercise of reasonable care. In the vast majority of these cases, the soil defects were obviously known to the builders. Logically, a builder will acquire knowledge of soil conditions through his excavations for foundations and utility lines.

■ In this case, the plaintiffs' theory as proposed by their proffered Instruction No. 2, was that the builder by building on the site gave "a warranty or guaranty that the site was fit for those purposes." We do not believe this to be a correct statement of the law of an implied warranty of habitabil-

---

8. Even prior to the development of the doctrine of implied warranty of habitability or fitness, courts had held that a builder-vendor could be held liable where he built on filled ground which was improperly compacted thereby causing the building to settle and become structurally damaged. Annot., 80 A.L.R.2d 1453 (1961).

ity as we have outlined above. Absent some express contractual provision, a home builder's implied warranty of habitability does not extend to adverse soil conditions which the builder is unaware of or could not have discovered by the exercise of reasonable care.[9]

It is for this reason that the Defendant's Instruction No. 5 was not improper as claimed by the plaintiffs. That instruction informed the jury that the defendant would not be liable if the soil slippage occurred "from some undisclosed pre-existing natural movement of the land or some other cause." We believe that this instruction basically followed the law of implied warranty of habitability or fitness, in that a home builder is not responsible for adverse soil conditions of which he is unaware or could not have discovered by the exercise of reasonable care.

Having found that the jury was properly instructed in this case, we affirm its verdict in favor of the defendant.[10]

Affirmed.

**9.** It should be observed that the builder cannot avoid liability under an implied warranty of habitability or fitness or under an implied warranty to construct in a workmanlike manner by claiming lack of knowledge of the defective construction work, because under these doctrines he is presumed to know his own construction work.

**10.** In view of our affirmance of the jury verdict in favor of the defendant, we do not discuss his cross-assignments of error.