486 S.E.2d 142

James P. THOMAS and Helen
C. Thomas, Appellants,

v.

GRAY LUMBER COMPANY, a West Vir-
ginia Corporation; Colony Construction
Company, a West Virginia Corporation;
Joe Linville, Individually; Reed, Patton
& Associates, Inc., a West Virginia Cor-
poration; Pat S. Reed, Individually; and
William P. Patton, Jr., Individually, Ap-
pellees.

No. 23353.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 21, 1997.

Decided April 16, 1997.

David L. Meade, Shinaberry & Meade Charleston, for Appellants.

James R. Sheatsley, Gorman & Sheatsley & Company, Beckley, for Gray Lumber Company.

Dwane L. Tinsley, Charleston, for Colony Construction.

Pat C. Fragile, Wooton, Wooton & Fragile, Beckley, for Joe Linville.

James G. Anderson, III, Anderson, Parkulo & Stansbury Beckley, for Reed, Patton & Associates, Pat S. Reed, and William P. Patton, Jr.

PER CURIAM:

This is an appeal by James P. Thomas and Helen C. Thomas, the plaintiffs in an action for damages relating to the defective construction of a house, from an order of the Circuit Court of Raleigh County granting the defendants summary judgment on multiple counts of the appellants' complaint. On appeal, the appellants claim that the trial court, given the status of the record, acted prematurely in awarding summary judgment. After reviewing the issues, and the record presented, this Court agrees and as a consequence, this Court reverses the decision of the circuit court.

In late 1991, the appellants, James P. Thomas and Helen C. Thomas, who were former West Virginians, but who had worked out of state for some time, contemplated returning to West Virginia for their retirement and contacted Reed Patton & Associates about purchasing a house, which was then partially completed on a lot owned by Reed, Patton & Associates. The documents in this case indicate that upon contacting Reed, Patton & Associates, the Thomases explained that they were retiring and were interested in purchasing a quality house since they did not wish to deal with house problems during their later years.

According to the documents filed by the Thomases, they were expressly assured by Reed, Patton & Associates and by William Patton and Pat Reed, who owned the stock of Reed, Patton & Associates, that the builder of the house in which they were interested

did excellent work, that no problems would arise, and that if any defects became apparent, they would promptly be repaired.

The party actually constructing the house was Colony Construction Company, the stock of which was owned by Laura Linville. This company was apparently being operated by Laura's husband, Joe Linville. The documents allege that prior to 1990, William Patton of Reed, Patton & Associates, had owned certain of the shares in Colony Construction, but that he had sold them to Laura Linville. The documents also indicate that Joe Linville of Colony Construction also represented to the Thomases that if any defects became apparent in the house being built for Reed, Patton, and Associates, the defects would be corrected.

According to the Thomases, based upon the representations made to them, they agreed to purchase the house on October 21, 1991, for the purchase price of $120,000.00. Upon agreeing to purchase the property, they signed a Real Estate Purchase Agreement drafted by Reed, Patton & Associates. In this agreement, Reed, Patton & Associates apparently served as both the broker and the seller in the transaction.

After the Thomases moved into their new home in January 1992, a number of problems and defects surfaced including excessive water under the house, water leaking into the fireplace from the chimney, siding breaking loose and buckling, inappropriate water pressure, and overloading of electrical circuits.

The Thomases requested that Reed, Patton & Associates correct the problems, and by letter dated April 28, 1992, William Patton, Jr. assured the Thomases that the defects would be corrected as soon as the weather allowed.

Thereafter, certain of the defects were partially corrected, but other defects became obvious. The Thomases learned that an air-conditioning unit had been installed without proper drainage and that more siding was coming loose from the house. Water problems continued. In October 1993, Reed, Patton & Associates undertook to repair certain of the problems, but the basement continued to fill up with water, and the Thomases were required to hire a contractor to correct the defects in order to continue to live in the house.

In 1994, cracks began to appear in the ceilings, and the floors began to sag. In July 1994, the roof began to sag. The Thomases contacted William Patton and Reed, Patton & Associates about certain of these problems. On September 13, 1994, the Thomases received a letter from an attorney for Reed, Patton & Associates and for William Patton and Pat Reed. In the letter Reed, Patton & Associates refused to repair the roof defects. As a consequence, the Thomases were forced to hire and pay structural engineers and contractors to evaluate and repair the roof.

On March 17, 1995, the Thomases filed a complaint against Reed, Patton & Associates, Inc., against Pat Reed and William Patton, individually, against Colony Construction Company, and against Joe Linville, individually. They also sued Gray Lumber Company which had provided materials for the house. In the complaint, which raised both contract and tort issues, they alleged that all the defendants had breached expressed and implied warranties as to the construction and workmanship of the house and that the house was constructed negligently of defective materials. They claimed that they had detrimentally relied on intentional, reckless and negligent misrepresentations by the defendants, and that the defendants, Reed Patton & Associates, Inc., and its principals, had been guilty of fraud and concealment, and breach of duty to inform of defects. The Thomases also claimed that the various parties were engaged in a joint venture in constructing and selling the house and that as joint venturers each should be liable for the derelictions of the others.

The defendants, Reed, Patton & Associates, Inc., Pat Reed, William Patton, Joe Linville, and Colony Construction Company, did not file answers. Instead, they filed motions to dismiss and motions for summary judgment under Rule 56 of West Virginia Rules of Civil Procedure. Reed, Patton & Associates attached an affidavit prepared by its president, William Patton, and the real estate purchase agreement entered into with the Thomases as well as the deed. The

affidavit alleged that the subject of the complaint was "a contractual matter" and that it did not concern personal injury. William Patton and Pat Reed filed individual motions which in essence covered the same matter.

Colony Construction Company filed a motion to dismiss in which it stated that there was no relationship or privity of contract between it and the Thomases. An affidavit signed by Joe Linville was attached to this motion. In the affidavit Colony Construction Company indicated that it was "engaged" by Reed, Patton & Associates for the construction of the speculation house and that it had no relationship or contact with the Thomases, contractual or otherwise, and it asserted that there was no privity of contact with the Thomases. The affidavit also stated that there was no basis for claim of personal injury against Colony Construction Company.

Gray Lumber Company also filed a motion to dismiss in which it stated that it had no contractual relationship with the Thomases, and also stated that no contractual arrangements existed between Colony Construction Company and Gray Lumber Company upon which allegations of fraud, misrepresentation, etc., could lie against Gray Lumber Company. Gray Lumber Company also filed an answer in which it admitted that it had supplied materials for the Thomas' roof and that Gray was engaged in the business of selling new construction material and providing certain building design and in installing materials in new homes.

On July 19, 1995, the motions made by the various parties defendant were argued before the Circuit Court of Raleigh County. Colony Construction Company's attorney stated that no written contract existed between Reed, Patton & Associates, and Colony Construction Company. The court questioned Colony as to the Thomas' allegations of joint venture. Colony replied that this was "an issue of fact, obviously that we deny." It also asserted, however, that since there was no written contract, there could be no joint venture.

Counsel for Joe Linville stated that since Joe Linville was an employee of Colony, he was exempt from liability.

Counsel for Gray Lumber Company admitted that Gray had provided construction materials for the home, and fabricated roof trusses. He also asserted, for the first time, that the Thomas' tort claims were barred by the statute of limitations. He further argued that any contractual claims which the Thomases had could not be asserted against Gray Lumber Company because of lack of privity between the Thomases and Gray Lumber Company.

At the conclusion of the proceedings the court entered summary judgment on multiple issues in the Thomas' complaint. Specifically, the court granted summary judgment as to all defendants except Colony Construction Company as to the warranty and contract claims. It was also granted as to all defendants on the detrimental reliance claims and the joint venture claims. Summary judgment was entered on all the negligence claims on the basis of the statute of limitations and as to all the other claims except as to defendants Colony Construction Company, Gray Lumber Company, and Joe Linville.

As previously indicated, the principal issue in the present case is whether the trial court properly granted summary judgment.

■ In *Aetna Casualty & Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court examined the circumstances under which a grant of summary judgment was appropriate. In Syllabus Point 3 of that case the court stated:

> A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

As can be seen from what has already been said about the present case, these were various causes of action asserted against various parties in the present case.

■ One of the principal claims asserted against Reed, Patton & Associates and its stockholder-agents, William Patton and Pat Reed, was contractual in nature and was that Reed, Patton & Associates was, in effect, the vendor/builder of the house which they pur-

chased, and that as such vendor/builder, Reed, Patton & Associates impliedly warranted the fitness and habitability of the house. The Thomases also claimed that the implied warranty was breached when the house did not prove to be fit and habitable in accordance with its intended use.

The trial court in granting summary judgment on this claim, in effect, rejected the Thomas' position because the court concluded that West Virginia's implied warranty of habitability and fitness did not apply to a party in the position of Reed, Patton & Associates since in the trial court's view Reed, Patton & Associates was the owner-seller of the house, rather than its builder.

The concept of an implied warranty of habitability and fitness for a new home was initially adopted by this Court in the case of *Gamble v. Main*, 171 W.Va. 469, 300 S.E.2d 110 (1983). The basic rule relating to the warranty as set forth in Syllabus Point 1 of the *Gamble* case stated:

> The purchaser of a new home is entitled to an implied warranty of habitability or fitness which requires that the dwelling be constructed by the builder in a workmanlike manner and that the property be reasonably fit for its intended use of human habitation.

Although the syllabus point refers to the builder of such a home, the body of the opinion makes reference to a "builder—vendor" and the real question posed by the present case is whether Reed, Patton & Associates is a "builder—vendor" as contemplated by the *Gamble* case. As previously indicated, the circuit court, in effect, found that it was not.

In *Gamble v. Main, Id.*, the court identified a number of reasons for adopting the implied warranty of habitability or fitness. Among other things, the court quoted with approval a portion of *McDonald v. Mianecki*, 79 N.J. 275, 287–89, 398 A.2d 1283, 1289–90 (1979), which stated:

> Tribunals have come to recognize that [t]he purchase of a new home is not an everyday transaction for the average family ... Courts have also come to realize that the two parties involved in this important transaction generally do not bargain

as equals. The average buyer lacks the skill and expertise necessary to make an adequate inspection.... Furthermore, most defects are undetectable to even the most observant layman and the expense of expert advice is often prohibitive.... The purchaser therefore ordinarily relies heavily upon the greater expertise of the vendor to ensure a suitable product....and this reliance is recognized by the building trade.....

*Gamble v. Main, Id.*, at 472, 300 S.E.2d at 113–14. In effect, a substantial part of the rationale for adopting the implied warranty rule is the notion that builder—vendors of new houses are generally in a much better position to recognize defects in workmanship potentially effecting habitability and fitness than are the purchasers.

In the discussion of the implied warranty rule after *Gamble v. Main, Id.*, the court did not clarify what is meant by a builder—vendor. See e.g. *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988). Thus, the real question in the present case is whether Reed, Patton & Associates qualifies as a "builder—vendor." within the meaning of *Gamble v. Main, supra.*

In arguing this point, it is apparent that the parties have focused on semantics. Reed, Patton & Associates has been called by one side merely a real estate agent, or broker, and not a builder—vendor, and the other side urges the Court to extend the *Gamble* rule to parties semantically called vendors. The trial court has also addressed this question essentially in terms of the semantic designation of the parties.

In reviewing the cases considered by this Court in announcing and discussing the implied warranty rule, the Court notes that it has principally looked at the roles played by the parties involved in the disputes, rather than at what they were precisely called from a semantic point of view. A key question in this Court's view was not whether someone was called a real estate agent or a builder, but whether one party, who arguably was involved in the construction of the house, regardless of what such party was called, was actually in the business of having houses

built and selling them, and was, because of its history and experience, and because the nature of its business, in a position to have the skill and expertise necessary to make an adequate inspection and to detect defects. As previously indicated, the fact that a vendor—builder was generally in that position, as opposed to a purchaser who was not in that position, was a factor which ultimately impelled this Court to recognize the implied warranty rule. In line with this, the Court said in note 6 of *Gamble v. Main, supra,* that the implied warranty was not extended to a homeowner· who built his own home and sold it on a non-recurring basis. The essential rationale for this position was the court did not believe that the average homeowner who built his own home on a non-recurring basis was in a position superior to the average purchaser of a home.

From the documents filed in the present case it does appear that Patton, Reed & Associates possibly fell into the category of parties who, because of their experience, and because of the nature of their business, generally possessed skill and expertise necessary to make an adequate inspection, and who, in effect, were in a better position to detect defects in workmanship than the ordinary purchaser. The documents in the case also raise the question of whether Reed, Patton & Associates was involved in a joint venture with Colony Construction Company in the construction of the Thomas' house. These facts suggests that Reed, Patton & Associates could have been a "builder—vendor" within the meaning of *Gamble v. Main, supra.*

Although the facts of the present case suggest that Reed, Patton & Associates qualifies as an owner-builder, in this Court's view the facts are inconclusive. The Court believes that for ultimate resolution of this case it would be desirable to determine how many houses Reed, Patton & Associates has constructed, or caused to be constructed, and sold as new houses. It would also be desirable to determine the history of its supervisory involvement with the construction of new houses in general, as well as its involvement with the construction of the house in issue in the present case. Further, it would be desir-

able to determine the construction expertise of the principal parties in the organization. Lastly, the question of whether it was actually involved as a joint venturer with Colony Construction Company is critical.

In effect, the Court believes that additional development of the facts would be desirable to clarify the application of the law to the implied warranty issues in this case. Under such circumstances Syllabus Point 3 of *Aetna Casualty and Surety Company v. Federal Insurance Company of New York, supra,* indicates that summary judgment is inappropriate, and in view of this, this Court believes that the summary judgment in the present case must be set aside.

■ Another claim made by the Thomases in the present case was that various defendants had made express warranties relating to the quality workmanship and materials involved in the construction of their house. They claim that these warranties had been made before, during and after they entered into a contract to purchase the house.

In entering into the contract to purchase the house, the Thomases signed a statement indicating that the seller had not made any representations or warranties relating to the physical condition of the property and indicating that they would not hold the seller bound by any agreement to alter, improve or repair the property not specifically set forth in the contract.

In granting summary judgment the circuit court, in effect, found that the Thomases, by signing the contract containing these stipulations, precluded themselves from asserting any warranties or representations not specifically set forth in the agreement, and made prior to our contemporaneous with the execution of the written contract. The court also found that any oral representations involved in this case were made prior to, or simultaneously with, the creation of the writing.

■ While this Court believes that in the absence of fraud, the parol evidence rule would preclude the Thomases from asserting any claim against the "seller" for representations not set forth in the agreement, the Court believes that the Thomas' claim in bringing this action is broad enough to cover

parties who may not necessarily have been parties to the sales contract. The Court believes that clarification of the facts is desirable to determine who precisely the "seller" was in the agreement signed by the Thomases. The Court does not believe that the agreement would bar the assertion of express warranties against any party not a party to that agreement, or not privy to the agreement. Further, the Court notes that the parol evidence rule allows parol evidence even where there is an express contract to show an additional independent or collateral agreement. See *Weirton Savings and Loan Company v. Cortez*, 157 W.Va. 691, 203 S.E.2d 468 (1974). And it is also admissible to prove a new or distinct agreement. See *Wilkinson v. Searls*, 155 W.Va. 475, 184 S.E.2d 735 (1971). Finally, the Court believes that parol evidence is admissible to contradict a writing in a case of fraud, *Hartmann v. Windsor Hotel Company*, 136 W.Va. 681, 68 S.E.2d 34 (1951).

Another claim asserted by the Thomases is that the trial court erred in holding that there was no joint venture involved in the present case.

■ This Court has indicated that a joint venture is an association of two or more persons for the purpose of making money to carry out a single business enterprise or transaction for profit. *Pownall v. Cearfoss*, 129 W.Va. 487, 40 S.E.2d 886 (1946).

The Thomases, in their complaint, also alleged that all the defendants engaged in a joint venture. They claimed that Reed, Patton & Associates acted as a real estate broker in marketing and selling the house and was the active owner of the house. They also claimed that Colony Construction Company and Joe Linville contributed their skills, labor and time as general contractors in the construction of the house, and that Gray Lumber Company, Colony Construction Company, Joe Linville and Reed, Patton & Associates contributed materials. Lastly, they claimed that Reed, Patton & Associates, William Patton, Pat Reed, Colony Construction Company, and Joe Linville supervised subcontractors. In paragraph 47 of their complaint they asserted that all the parties were engaged in a joint venture as owner and seller, materials, designer, contractor of construction, and seller of the premises, and that each performed acts beneficial to the others.

In this Court's view the documents filed thus far are sufficient to suggest that all the defendants, or at least some of the defendants, were associating together for the purpose of carrying out a single business transaction for their joint profit, and that there is a potentiality that a joint venture did exist as a joint venture is defined under our law.

At the very least, this Court believes that a full examination and development of the facts as to the contribution of each, and as to how the profit of each was to be determined, is ultimately necessary for a fair resolution of the Thomas' joint venture claim. In view of the fact that further development is desirable, this Court believes that the trial court again erred in awarding summary judgment. In conjunction with this, the Court notes that Colony Construction Company rather clearly recognized before the trial court that the joint venture issue was a question of fact.

Another assertion made by the Thomases on appeal is that the trial court erred when it decided as a matter of law, and before discovery had been conducted, that they had discovered all the elements of their actions for defective workmanship and materials more than two years before the institution of their suit, and that as a consequence their claims for negligent workmanship and materials, and other tort claims, were barred by the statute of limitations.

As previously indicated, the Thomases entered into a purchase contract for the property in question on October 21, 1991, and they actually moved into the house in January 1992. They noticed certain problems with the property almost immediately after moving in, and, as time progressed, they noticed additional problems. They did not file the complaint instituting the present action until March 17, 1995.

■ The circuit court apparently concluded that the two-year statute of limitations contained in W.Va.Code § 55–2–12 governed the question of whether the tort aspects of the Thomas' complaint were timely filed, and

the court, after examining the circumstances of the case, ruled that the Thomases discovered or reasonably should have discovered the circumstances leading to their rights to action more than two years prior to the institution of the action, and that as a consequence the action was barred by the statute of limitations.

The Court notes that W.Va.Code § 55–2–6a establishes a separate limitations period for defects in builder's construction of improvements on real property. That statute provides:

> No action, whether in contract or in tort, for indemnity or otherwise, nor any action for contribution or indemnity to recover damages for any deficiency in the planning, design, surveying, observation or supervision of any construction or the actual construction of any improvement to real property, or, to recover damages for any injury to real or personal property, or, for an injury to a person or for bodily injury or wrongful death arising out of the defective or unsafe condition of any improvement to real property, may be brought more than ten years after the performance or furnishing of such services or construction: Provided, That the above period shall be told according to the provisions of section twenty-one [§ 55–2–21] of this article. The period of limitation provided in this section shall not commence until the improvement to the real property in question has been occupied or accepted by the owner of real property, whichever occurs first.

This Court has indicated that the purpose of this statutory enactment was to set an arbitrary time period after which no action, whether in contract or tort, may be initiated against architects and builders. The Court has also indicated that pre-existing statute of limitations for both contract and tort actions continued to operate within the outside limits set by the statute. See *Gibson v. West Virginia Department of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991), and *Shirkey v. Mackey,* 184 W.Va. 157, 399 S.E.2d 868 (1990). Further, in *Basham v. General Shale,* 180 W.Va. 526, 377 S.E.2d 830 (1988), the Court held that the ten-year period contained in this statute is not applicable in an

action against the manufacturer of allegedly defective construction materials.

The Thomases on appeal do not take issue with the fact that the two-year statute of limitations applies to the tort aspects of their case in spite of the wording of W.Va.Code § 55–2–6a. They do, however, contend that they were subjected to a continuing tort within the meaning of *Handley v. Town of Shinnston,* 169 W.Va. 617, 289 S.E.2d 201 (1982), and that the defendants or certain of the defendants concealed what was occurring from them.

 The general proposition in this State is that the limitation's period in an action commences running from the date of injury. *Hall's Park Motel, Inc. v. Rover Construction, Inc.,* 194 W.Va. 309, 460 S.E.2d 444 (1995), *State ex rel Ashworth v. State Road Commission,* 147 W.Va. 430, 128 S.E.2d 471 (1962), and *Boyd v. Beebe,* 64 W.Va. 216, 61 S.E. 304 (1908). There are, however, a number of special situations which can affect the application of this general rule. One of those situations is discussed in *Jones v. Trustees of Bethany College,* 177 W.Va. 168, 351 S.E.2d 183 (1986). That situation arises where within a brief, discrete period of time all the elements of a tort occur or manifest themselves and the plaintiff suffers a noticeable injury, then for substantial period of time thereafter the plaintiff sustains a worsening of the injury. In such a situation the breach of duty by the tortfeasor is completed, but the damage is ongoing. See *DeRocchis v. Matlack, Inc.,* 194 W.Va. 417, 460 S.E.2d 663 (1995).

Contrary to the assertions in the present case, this Court does not believe that any tort committed by the defendants was a continuing tort within the meaning of *Handley v. Shinnston, supra.* Instead, any tort committed fell within the category discussed in the *Hall's Park Motel* case, i.e., a potential tort committed was committed and the breach of duty was completed at the time the Thomas' house was completed and turned over to them. There was evidence, or there are allegations, that the damage arising from the breach of duty was continuous or might have been continuing, but the evidence rather clearly suggests that the Thomases were

aware of the defects in 1992. Accordingly, this Court cannot conclude that the trial court erred in finding, in effect, that there was no continuing tort and that the limitation period, not taking into consideration any allegation of attempt by the defendants to conceal the defects, began to run in 1992, and that the Thomas' action was accordingly barred by the statute of limitations.

In spite of this, the Court notes that the Thomas' claim that the defendants, after being contacted regarding certain defects, engaged in fraudulent concealment of certain aspects of the situation.

In *Sattler v. Bailey*, 184 W.Va. 212, 400 S.E.2d 220 (1990), this Court recognized that the limitations period in a statute of limitations is tolled when a wrongdoer does something to prevent discovery of the wrong. Under this rule, the limitation period on the Thomas' claims would not begin to run as to those defects which they were prevented from discovery until they actually discovered such defects.

It is not altogether clear to this Court what defects were known to the Thomases more than two years prior to the filing of this action, and what defects became known only within two years prior to the filing of this action. Further, the Court cannot say from what is available whether the defendants actually did attempt to conceal the defects from the Thomases.

Under the circumstances of the case, the Court believes that at the very least further development of the evidence is necessary to clarify the application of the law and under such circumstances the rule in *Aetna Casualty & Surety Company v. Federal Insurance Company of New York, supra,* indicates that summary judgment is inappropriate.

Another claim made by the Thomases is that circuit court erred in holding as a matter of law that defendants, William Patton and Pat Reed were not individually liable for breach of contract.

The Thomas' claim that William Patton and Pat Reed were individually liable because they made separate agreements with them to persuade them to enter into the purchase contract. The trial court, in essence, ruled that William Patton and Pat Reed acted solely as agents and that as a consequence they were not personally liable on any agreement which they entered into.

As with the other points, this Court believes that it is desirable to develop the record further to determine whether there were, in fact, separate agreements which were outside the agents' authority and whether such agreements were collateral agreements within statute of frauds, which must be in writing to be enforceable or whether they were of such a separate nature as to be enforceable if only orally made.

For the reasons stated, this Court concludes that the summary judgment order of the circuit court must be reversed and this case must be remanded for further development.

The judgment of the Circuit Court of Raleigh County is, therefore, reversed, and this case is remanded for further development.

Reversed and remanded.